**GENERAL OVERSEAS FILMS, LTD., Plaintiff,**

v.

**ROBIN INTERNATIONAL, INC., and The Anaconda Company, Defendants.**

No. 78 Civ. 1799 (ADS).

United States District Court, S. D. New York.

June 23, 1982.

Cohn, Glickstein, Lurie, Ostrin, Lubell & Lubell, New York City, for plaintiff; Jonathan W. Lubell, Laurence R. Kruteck, Audrey J. Isaacs, New York City, of counsel.

Hendler & Murray, New York City, for defendant Anaconda Co.; Jerome Murray, Robert Wang, John Nocera, New York City, of counsel.

Chester B. Salomon, P. C., New York City, for Robin Intern., Inc.

## OPINION AND ORDER

SOFAER, District Judge:

In this action, plaintiff General Overseas Films, Ltd. ("GOF") seeks to collect on a loan guarantee that it alleges was provided on behalf of The Anaconda Company ("Anaconda") by Charles H. Kraft, Anaconda's Vice President and Treasurer. Plaintiff GOF claims that Anaconda promised through Kraft to guarantee the repayment of loans made by GOF to Robin International, Inc. ("Robin"). Plaintiff also claims that Anaconda, acting through Kraft, guaranteed Robin's obligations and liabilities in connection with certain related transactions.

In 1976, Nicholas Reisini approached Robert Haggiag, whom he had known since 1955, for a loan of $500,000 to Robin, a company that Reisini owned and controlled. Haggiag, an international film producer, was and is "solely empowered and responsible for the operations and transactions of GOF." (Haggiag Aff. at 1) Reisini told Haggiag that Robin was building the Soviet Union's United Nations Mission in Riverdale, New York. (Haggiag Dep. at 21) Haggiag's brother, Ever Haggiag, was interested in acquiring the rights to a building process used in constructing the mission. Reisini told Haggiag that there were claims of approximately $1,000,000 against the project, but that he believed the claims could be settled for about one-half that amount.

Haggiag agreed on behalf of GOF to lend Robin and Reisini $500,000 for the purpose of settling the claims against Robin. Reisini promised to repay the loan at six percent interest and, in addition, to pay GOF fifty percent of whatever savings could be achieved through the settlement of claims pending against the project. (Haggiag Aff. at 5) Defendant explains in its memorandum that "[a]lthough the purpose of the initial loan was allegedly a step in the acquiring of [the] rights [to the construction process] by Ever Haggiag, the initial transaction and documentation ... only pertained to assisting Reisini in alleviating the debts ... [that] had [been] incurred in the construction of the mission." (Def.Mem. at 6) The agreement was executed on May 28, 1976, and the money was placed in escrow with a law firm.

Several months later, Haggiag was advised that a portion of the $500,000 had been used to settle claims but that the remainder of the money had been transfer-

red to Reisini with Ever Haggiag's approval. Reisini told Haggiag that he had transferred the funds to Robin, and was attempting to settle the pending claims himself. He requested that Haggiag postpone demanding payment, and promised that he would pay the full amount by January 15, 1977, the second payment date under the original loan agreement. In November 1976, Haggiag asked Reisini about payment on the note. Reisini assured Haggiag that the money due him would be paid, but that presently he was short of cash. (Haggiag Aff. at 7) Thereafter, Reisini asked Haggiag to consider whether he would extend the January 15 due date if Reisini could provide a guarantee from a large public company. Reisini mentioned the name Anaconda and said that the company had some involvement in constructing the mission in Riverdale. (*Id.* at 7)

Reisini introduced Haggiag to Charles Kraft, who was then Vice-President and Treasurer of Anaconda. Kraft told Haggiag that Anaconda would guarantee Robin's debt to GOF for up to $1,000,000. Reisini agreed to give GOF a $1,000,000 note, and Kraft agreed to provide Anaconda's guarantee for the same amount. Reisini also asked Haggiag to advance more funds to Robin so that the loan would conform with the principal amount of the note Robin would issue to GOF. Haggiag declined to do so; but on or about December 1, 1976 he did advance on behalf of GOF an additional $60,000. Haggiag met with Kraft and Reisini on December 13, 1976 and received the note and guarantee, which specified September 13, 1977 as the due date.

Shortly before September 13, 1977, Reisini again told Haggiag that he did not have the cash to pay the note. He assured Haggiag that the money would be forthcoming and asked Haggiag to extend the due date. Haggiag agreed, and also exchanged the $1,000,000 note for an $800,000 note. The parties agreed upon the $800,000 figure after taking into consideration the advances made by Haggiag, interest on the advances, and the savings effected through settlement of claims on the Riverdale construction project. In addition, Haggiag received a letter from Kraft purporting to confirm the continuation of Anaconda's guarantee, but only to the extent of $800,000.

Just before December 15, 1977, the due date of the $800,000 note, Reisini asked Haggiag for yet another extension. Haggiag agreed to return the $800,000 note in exchange for two notes, one in the amount of $500,000, payable January 31, 1978, and the other for $300,000, payable March 13, 1978.

Reisini paid Haggiag $500,000, satisfying the first note. Before the $300,000 note became due, however, Reisini once again asked for Haggiag's forbearance. Haggiag agreed to accept a $300,000 demand note in exchange for the $300,000 note due March 13. Soon after, Haggiag learned that Reisini and Kraft had been implicated in a number of fraudulent transactions.[1] Haggiag demanded payment, but Reisini and Robin have not paid. Robin apparently has no defense, but is insolvent. *See* Letter from Chester B. Salomon to Robert Wang (June 1, 1982). GOF is therefore seeking to recover from Anaconda on the basis of the guarantee extended by Kraft in Anaconda's name.

Soon after this case was filed the parties were informed that the Court would deny any motion for summary judgment, as it had in a related case that was later settled. The parties nevertheless wished to avoid a trial, and have stipulated to submit the case for judgment by the Court, in lieu of trial, upon an agreed record. They have agreed with the Court's approval to waive any right to call witnesses or to cross-examine them, beyond the examinations contained in the depositions and trial transcripts submitted. Accordingly, the Court has exam-

---

1. During pre-trial proceedings in the present case, two related cases were pending before this Court. *Anaconda Co. v. Bank of New York*, 78 Civ. 5583, *Anaconda Co. v. Bankers Trust Co.*, 78 Civ. 5560, and one was pending before the Northern District of California, *Ana-*

*conda Co. v. Wells Fargo Bank*, C790055 (N.D. Calif.). Each of these cases was settled. In addition, Reisini and Kraft were both convicted in criminal cases brought by the United States Attorney for the Southern District of New York.

ined all materials and memoranda of law submitted by the parties in support of judgment. The facts necessary to dispose of this case appear undisputed on close examination of the record. In any event, if disputes as to material facts exist, they are resolved in accordance with the findings and conclusions in this opinion.

Anaconda asserts as its primary defense to the action that the guarantee extended by Kraft does not bind Anaconda, since Kraft lacked actual or apparent authority to engage in the transaction. Plaintiff concedes that Kraft had no actual authority to bind Anaconda to this undertaking; it relies solely on Kraft's apparent authority to do so. Since on this record it is clear that Kraft lacked apparent authority to engage in the transactions considered, Anaconda's other defenses need not be addressed.[2]

The general rule in New York is that "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." *Ford v. Unity Hospital*, 32 N.Y.2d 464, 472, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973). The doctrine of apparent authority delineates the grounds for imposing on the principal losses caused by its agent's unauthorized acts. The law recognizes that an agent, such as Kraft, may engage in a fraudulent transaction entirely without his principal's approval but nevertheless under circumstances that warrant holding his principal accountable. As the Court of Appeals for this Circuit explained:

> Apparent authority is based on the principle of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his

---

**2.** Under the law of New York, in addition to the elements discussed in the text, the doctrine of apparent authority appears to require detrimental reliance—that is a change of position—by the plaintiff on the basis of the *agent's* misrepresentation of his authority. *Ford v. Unity Hospital, supra,* 32 N.Y.2d at 473, 346 N.Y.S.2d at 244, 299 N.E.2d at 664; *Masuda v. Kawasaki Dockyard Co., supra,* 328 F.2d at 665. Some formulations appear to provide that detrimental reliance on the *principal's* manifestations of assent to the agent's authority is not necessary to apparent authority and is more properly considered under the doctrine of estoppel. *See Restatement 2d,* Agency, *supra,* §§ 8B, 27. But some courts have held that detrimental reliance on the principal's conduct is essential to apparent authority as well. *E.g., In re Sterling Navigation Co.,* 444 F.Supp. 1043, 1048–49 (S.D.N.Y.1977). In practice this may be a distinction without a difference. Apparent authority requires that the principal's conduct give rise to a reasonable belief in the agent's authority, and also requires detrimental reliance on the agent. It may be that reliance on the principal's conduct will inevitably be present when these two elements are satisfied.

In either event, considerable doubt exists as to whether GOF has met its burden of proving that it acted in reliance on the purported guarantee of Anaconda by changing its position based on either Anaconda's or Kraft's acts. Haggiag loaned $500,000 to Robin before Kraft was even on the scene. He loaned an additional $60,000 after being assured by Kraft that Anaconda would guarantee an amount up to $1,000,000, but before the purported guarantee was executed or delivered. He repeatedly testified that he had made the original loan as a courtesy to his brother, without any investigation, despite his total lack of experience in lending. He claims to have extended the due date of the amounts involved in reliance upon Kraft's offer to guarantee payment, but the proof fails to establish that extensions would not have been made but for the guarantee. Although this issue is not pursued by Anaconda, the record indeed permits an inference contrary to that asserted by GOF.

Anaconda vigorously argues that the purported guarantee expired upon Robin's repayment of the $500,000 actually borrowed, and Haggiag's return of the original document of guarantee to Kraft. GOF claims the guarantee was returned earlier, in exchange for a letter continuing its terms but limiting Anaconda's liability to $800,000. Kraft testified, however, that the guarantee was returned after the letter was written, and after repayment of virtually all the funds borrowed. Kraft regarded the guarantee as expiring when the original document was returned. His testimony has been accurate in all material respects, and is far more reasonable and reliable than Haggiag's on this issue. It is unlikely that Haggiag, an experienced businessman, would turn over an original guarantee instead of merely agreeing to its modification. Robin's present debt to GOF consists almost entirely of the profit for which GOF negotiated in connection with its loan to Robin, profit generated by "savings" on settled claims.

position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized.

*Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir. 1964). The doctrine rests not upon the agent's acts or statements but upon the acts or omissions of the principal. It is invoked when the principal's own misleading conduct is responsible for the agent's ability to mislead. *Ford v. Unity Hospital, supra*, 32 N.Y.2d at 473, 346 N.Y. S.2d at 244, 299 N.E.2d at 664. As defined in the Restatement a principal causes his agent to have apparent authority

> by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf ....

Restatement, Agency 2d § 27 (1958). Therefore, to determine whether Kraft had apparent authority to guarantee the loan on behalf of Anaconda requires a "factual inquiry [focusing upon] the principal's [Anaconda's] manifestations to the third person [Haggiag] ...." *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, 414 F.2d 750, 756 (9th Cir. 1969). The Ninth Circuit has stated:

> The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area in which the agent acts and negotiates.

*Id.* (citing Seavey, Law of Agency, § 8, at 13). The initial question, therefore, is whether Anaconda's conduct permitted Haggiag actually and reasonably to believe that Kraft was authorized to execute this guarantee. Under the law of New York, the circumstances of the transaction known to the plaintiff must also be scrutinized to determine whether it fulfilled its primary "duty of inquiry."

GOF relies on several aspects of Anaconda's conduct in arguing that Anaconda conferred apparent authority on Kraft for the transactions in which he engaged with GOF. Anaconda placed Kraft in a high and visible corporate position, with broad powers over financial affairs. It gave Kraft Anaconda stationery displaying his corporate titles, an office in the company's executive suite, business cards, access to the corporate seal, and put his picture in its annual report. Anaconda officers and publications announced to the financial community that Kraft was the individual at Anaconda with whom to discuss the company's "financial needs." Plaintiff argues that "Anaconda held Kraft out as having the full range of authority and responsibility for Anaconda's financial matters," (P.Mem. at 10) and characterizes Kraft as Anaconda's "emissary to the financial community," (*id.* at 9). Specifically, Anaconda adopted and made available to Kraft Article 9 of Anaconda's bylaws, conferring upon Kraft, as Treasurer, authority "to sign checks, notes, drafts, bills of exchange and other evidences of indebtedness...." Kraft showed this bylaw, as well as his picture in Anaconda's annual report, to Haggiag at their initial meeting. By these actions, plaintiff contends, Anaconda gave such convincing evidence of Kraft's authority to sign guarantees that several sophisticated banks extended some $34 million in credit to Reisini's companies, at Kraft's request, through transactions similar to GOF's with Robin. GOF argues:

> That six sophisticated banks had agreed to all of Kraft's proposals over a six-year period is vivid testimony to the widespread recognition among professionals of the authority inherent in the position of a corporate Treasurer.

(*Id.* at 25).

Those transactions, moreover, constitute in plaintiff's view strong evidence of the reasonableness of GOF's conduct: "six sophisticated financial institutions and Kraft's own superiors did not question for more than six years the fact that Kraft's actions on behalf of Anaconda were proper, legitimate and fully authorized." (*Id.* at 27–28). Further, GOF cites as evidence of

the reasonableness of its belief in Kraft's apparent authority the fact that Haggiag asked a distinguished member of the bar whether the papers Kraft presented Haggiag were in good order; the attorney allegedly told Haggiag that the papers appeared to be in proper form. Haggiag also inquired as to Anaconda's interest, and was told that the company had supplied or produced the walls of the Russian mission that Robin had built. Finally, GOF contends that, had Haggiag inquired further into Kraft's authority, he would not have discovered anything to cast doubt upon the transactions' propriety, since Kraft was the person at Anaconda authorized to produce evidence as to both the authority to transact business on behalf of Anaconda and any changes in that authority.

GOF's arguments would have force in a situation that fell within the range of transactions in which companies like Anaconda normally engage. But the transaction involved in this case is extraordinary, and should have alerted Haggiag to the danger of fraud. Because the circumstances surrounding the transaction were such as to put Haggiag on notice of the need to inquire further into Kraft's power and good faith, Anaconda cannot be bound. *See Angerosa v. White Co.*, 248 A.D. 425, 432, 290 N.Y.S. 204, 214 (4th Dep't 1936), *aff'd*, 275 N.Y. 524, 11 N.E.2d 325 (1937) (per curiam); *Lee v. Jenkins Bros.*, 268 F.2d 357, 365 (2d Cir. 1959); 2 N.Y.Jur.2d, Agency § 74 (1979).

A corporate treasurer, it is true, must be regarded as having broad authority to commit his or her company in financial dealings. Large companies such as Anaconda generally establish ongoing relations with several banks. The banks are kept informed of the financial status of these companies through regular reports. They are also advised of exactly whom to deal with at such companies in all financial matters, and are provided with evidence of the individual officer's authority. In this case, Anaconda designated Kraft as its authorized contact in financial affairs, and it widely published Article 9 of its bylaws as evidencing the scope of Kraft's authority. Anaconda thereby placed Kraft in a position that enabled him to commit the company, when he was acting within the scope of Article 9, to any transaction that appeared reasonably related to Anaconda's business. *See* Restatement 2d, Agency, *supra*, § 39 ("Unless otherwise agreed, authority to act as agent includes only authority to act for the benefit of the principal.") Anaconda and companies like Anaconda often need on-the-spot, informal commitments from banks, and they operate in a manner that enables them to obtain such commitments. Banks, on the other hand, need and compete for customers such as Anaconda, and they reasonably attempt to meet the needs of such customers by dealing as swiftly and informally with authorized officers as the circumstances of a particular transaction reasonably permit.

■ The existence of apparent authority depends in part upon "who the contracting third party is." *Lee v. Jenkins Bros., supra*, 268 F.2d at 370. GOF is not a bank, or otherwise the type of company with whom Anaconda needed to deal swiftly and regularly in its financial affairs. It had no relationship with Anaconda before the transaction concerning Robin. It had neither the need nor the capacity to seek or compete for Anaconda's financial business by extending services or courtesies without the investigation normally made. GOF maintained no file on Anaconda; it had no idea of the company's financial condition beyond glancing at Anaconda's latest annual report. A bank with whom Anaconda (and Kraft) regularly dealt might more reasonably rely on Kraft's position as evidence of broad authority in most types of financial matters. *See Hall v. Ochs*, 34 App.Div. 103, 106, 54 N.Y.S. 4, 6 (2d Dep't 1898) ("the largest class of cases of agency is that which relates to trade affairs, where the agency is proved by inference, from the habit and course of dealing between the parties"). But given GOF's lack of experience and knowledge in banking, GOF's lack of a prior relationship with Anaconda, and GOF's lack of any interest in creating an ongoing relationship with Anaconda, it can-

not claim to have the same reasonable basis for such reliance. The messages Anaconda implicitly may have conveyed in its dealings with banks could not have been intended for a company in GOF's situation nor reasonably available to such a company as a basis for its reliance.

More important, the nature of the specific transaction—a guarantee by Anaconda of the debt of an unrelated corporation—was extraordinary and thus sufficient to require inquiry by GOF before it relied on Kraft's purported authority. Article 9 of Anaconda's bylaws is properly cited by plaintiff as conduct of the principal which could give rise to apparent authority. But GOF has no basis for arguing that Article 9 of Anaconda's bylaws conferred or reasonably appeared to confer authority on Kraft to sign a guarantee, let alone one to a third, unrelated company. The bylaw implicitly but clearly refutes the notion that Kraft had authority to sign guarantees. The language conferring power on him to sign evidences of indebtedness occurs in a context that pertains entirely to Anaconda's direct borrowing activities. It reads:

> The Treasurer or Assistant Treasurer shall have the custody of all the funds and securities of the Company, and shall have power on behalf of the Company to sign checks, notes, drafts, bills of exchange and other *evidences of indebtedness,* to borrow money for the current needs of the business of the Company and assign and deliver for money so borrowed stocks and securities and warehouse receipts or other documents representing metals in store or transit and to make short-term investments of surplus funds of the Company and shall perform such other duties as may be assigned to him from time to time by the Board of Directors, the Chairman of the Board, the Vice Chairman of the Board or the President.

P. Submission of May 28, 1982, Ex. 1–B (emphasis added). Plaintiff argues that the phrase "evidences of indebtedness" includes guarantees, citing *Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 359, 390 N.Y.S.2d 622, 624 (2d Dept. 1977), for the proposition that a guarantee is "an agreement to pay a debt owed by another." (*See* P. Reply Mem. at 28 n.9) A guarantee is not, however, an "evidence of indebtedness"; it is an agreement collateral to the debt itself. *See id.* at 359–60, 390 N.Y.S.2d at 625; *First Nat'l Bank of Clayton v. Frisco Park Realty Co.,* 510 S.W.2d 59, 62 (Mo.App. 1974); 57 N.Y.Jur., Suretyship and Guarantee § 15 (1967). The general rule is that "[e]xpress authority to execute or indorse commercial paper in the principal's name . . . does not include authority to draw or indorse negotiable paper for the benefit . . . of any other person; *authority to sign accommodation paper or as security for a third person must be specially given.*" 510 S.W.2d at 62 (quoting 2 Am.Jur., Agency, § 176, p. 140) (emphasis in original). In New York "the power of an agent to bind the principal in contracts of guaranty or suretyship can only be charged against the principal by necessary implication, where the duties to be performed cannot be discharged without the exercise of such a power, or where the power is a manifestly necessary and customary incident of the authority bestowed upon the agent, and where the power is practically indispensable to accomplish the object in view." *First Nat'l Bank of Ann Arbor v. Farson,* 226 N.Y. 218, 224, 123 N.E. 490, 492 (1919). No such necessity appears in Article 9, from Kraft's position, or from the circumstances of this transaction.

Plaintiff contends that, regardless of whether a guarantee is an evidence of indebtedness, the language of Article 9, when reasonably interpreted, gives the appearance of such authority. This argument proceeds on the theory that Kraft's actual "authority in other transactions gave him apparent authority in this transaction." (P.Mem. at 37) But the nature of a guarantee is such that "[h]owever general the character of the agency may be, a contract of guaranty or suretyship is not normally to be inferred from such an agency." 2 S. *Williston, A Treatise on the Law of Contracts,* § 277A, at 230 (3d Ed. 1959); *accord, National Surety Corp. v. Inland Properties,*

*Inc.*, 286 F.Supp. 173, 181 (E.D.Ark.1968), *aff'd*, 416 F.2d 457 (8th Cir. 1969). The guarantee of Robin's debt to GOF, standing alone, had no apparent connection with the financial interests of Anaconda. Unlike a loan or other debt undertaken by Anaconda for its own benefit, a guarantee results in a loan by the creditor of funds to a third party, or, as in this case, in the creditor's agreement to defer collecting on a loan previously extended to a third party. Unless the transaction has other elements connecting it to the guarantor, it is not the sort of arrangement in which the guarantor company's treasurer or other financial officer normally should be expected to engage:

> [S]uch a contract is unusual and extraordinary and so not normally within the powers accruing to an agent by implication, however general the character of the agency; ordinarily the power exists only if expressly given. Consequently a manager, superintendent, or the like, of business or property cannot ordinarily bind his principal as surety for third persons.

2A C.J.S., Agency § 181, at 849 (1979) (footnotes omitted). This widely recognized principle is accepted in New York, where, although the existence of authority to enter such contracts is a question of fact, *Rosenkranz v. Schreiber Brewing Co.*, 287 N.Y. 322, 325, 39 N.E.2d 257, 257 (1942), for example, "it is a thoroughly established rule of law that a partner has not implied authority to bind his partner or the partnership by contracts of guaranty or suretyship, either for himself individually or for third persons." *First Nat'l Bank of Ann Arbor v. Farson, supra*, 226 N.Y. at 223, 123 N.E. at 491. Where an agent purports to bind his principal to such a commitment the third party is put on notice that the transaction is of questionable validity:

> If [the third person] knows that the agent is acting for the benefit of himself or a third person, the transaction is suspicious upon its face, and the principal is not bound unless the agent is authorized. Thus, where the agent signs the principal's name as an accommodation endorser . . . the other party obtains no rights

against the principal because of such transaction, unless authorized.

Restatement 2d, Agency, *supra*, § 165, comment c, at 390. Thus, "[g]enerally, contracts of guaranty and suretyship not in the regular line of corporate business cannot be made by corporate officers without express authority; ordinarily there is no apparent authority in an officer to make such a contract." *National Surety Corp. v. Inland Properties, Inc., supra*, 286 F.Supp. at 181.

Had Kraft purported to borrow money for Anaconda, or in a credible manner for Anaconda's benefit, he could have bound Anaconda even if he in fact intended and managed to steal the money involved. Had Anaconda itself done anything to suggest it had an interest in Robin or in the transactions at issue, a stronger case for apparent authority would be presented. But in this case, Anaconda was neither directly nor indirectly involved in the transaction between GOF and Robin, and GOF has not pointed to any actions by Anaconda suggesting involvement. The only connection between Anaconda and Robin suggested to Haggiag was a vague statement by Reisini that Anaconda had provided "curtain walls" in the Russian mission. These remarks are of minimal significance since they can in no way be attributed to Anaconda, and therefore cannot give rise to apparent authority. Moreover, Haggiag admits that the words curtain walls "sounded strange," and that he had no real interest in the subject. (Haggiag Dep. at 82) Kraft made no representation about any connection between Robin and Anaconda, and even if he had, he could not thereby have supplied any more of a basis for apparent authority than he did by his assertions to Haggiag that he had the power to execute the guarantee. *See Ford v. Unity Hospital, supra*, 32 N.Y.2d at 472–73, 346 N.Y.S.2d at 244, 299 N.E.2d at 664. The situations in which courts have bound principals on guarantees issued by their agents are those in which authority to do so is express, or clearly implied from functions assigned to and performed by the agent involved. *See, e.g., Hess v. W & J Sloane*, 66 App.Div. 522, 526, 73 N.Y.S. 313

(1st Dep't 1901) (principal had interest in success of transaction and agent had actual authority over all aspects of account in question); *Trimline Window Frame, Inc. v. Rural New Yorker, Inc.,* 8 Misc.2d 645, 646–47, 168 N.Y.S.2d 170, 172 (1957) (defendant had actually paid on part of guarantee); *cf. Rosenkranz v. Schreiber Brewing Co., supra,* 287 N.Y. at 325, 39 N.E.2d at 257 (circumstances created question of fact for jury). Otherwise, such a guaranty has no apparent relationship to the principal's business, and one who receives what appears to be a guarantee is put on notice that he must inquire further before relying on it. Under these circumstances, Kraft's authority to bind Anaconda to this transaction was far from apparent.

Plaintiff relies heavily on the fact that six banks were also taken in by Kraft and Reisini in various ways. It argues that the banks' similar conduct shows that GOF's belief in Kraft's authority, and its reliance on him, was commercially reasonable; GOF also argues that Haggiag properly relied on the existence of parallel transactions as evidence of Kraft's authority. But the banks in fact treated Article 9 of Anaconda's by-laws as evidence that Kraft *lacked* authority to sign guarantees. Not one of them accepted a simple guarantee arrangement. Instead they designed alternative arrangements that they felt provided them security, but at the same time avoided a guarantee as such. Thus, Marine Midland, Wells Fargo, Bank of America, Paribas, and Bankers Trust, all accepted letters of credit, rather than guarantees; Singer & Friedlander extended what was in form a loan to an Anaconda subsidiary, Anaconda International; and Bank of New York received a collateral agreement to repurchase Robin's debt, rather than an outright guarantee. The conduct of these banks reflects the commercially reasonable view that Anaconda had not put Kraft in a position that made him appear authorized to execute guarantees. Furthermore, some of the banks sought and obtained explanations for at least some of these transactions that are far more credible than that given Haggiag by Reisini. Kraft told Bankers Trust, for example, that Robin was arranging an international sale of copper from which Anaconda was to benefit directly. P. Submission of May 28, 1982, Ex. 4–A. He told Marine Midland that Anaconda was helping General Acquisitions Corp., another company in which Reisini had an interest, because the company had certain rights to acquire a mining process in which Anaconda was allegedly interested. *Id.* Ex. 6–A. More important, some of the banks also sought and obtained resolutions confirming Kraft's authority in more specific terms than contained in Article 9. Thus, Marine Midland at one point requested and obtained a corporate resolution stating that Kraft had authority to execute and deliver letters of credit, *id.* Ex. 6–L; and the Bank of New York sought at the outset and obtained an opinion of counsel from Anaconda that Kraft was authorized to execute a note purchase agreement, *id.* Ex. 8–C & 8–D. None of these explanations or forged documents constituted strong proof of apparent authority, but they made the banks' reliance more reasonable than GOF's.

In any event, GOF cannot safely rely upon the conduct of the banks with whom Anaconda dealt as establishing Kraft's apparent authority or as reflecting reasonable reliance upon Kraft's position or representations. The litigation between Anaconda and the banks from whom Kraft and Reisini stole money has been settled. No definitive ruling is necessary, therefore, as to Kraft's apparent authority or the reasonableness of the banks' reliance in those situations. The banks were not able, however, to prove that they had regularly engaged in other transactions similar to those in which they engaged with Kraft. They doubted Kraft's authority to sign guarantees, and structured the transactions to avoid the limitation implicit in Article 9, through the use of letters-of-credit that differed markedly from those normally used by corporations in their regular commercial dealings.[3] Nor did those banks which had explanations for

---

3. *See generally* H. Harfield, *Letters of Credit* (1979).

Anaconda's interest in the loan behave entirely in accordance with customary practice; for example, one bank paid the funds Robin had borrowed directly to Robin, even though the funds were allegedly intended for the purchase of copper from Anaconda. The record in those cases, including the five week trial in *Anaconda Co. v. Bankers Trust Co.* 78 Civ. 5560, establishes that those settlements were affected by the strong case of negligence made by the banks against Anaconda's parent company. That case of negligence, however, was based on events and conduct that have no pertinence to GOF's claim.[4]

Plaintiff's argument that Haggiag's knowledge of some of these transactions made his belief in Kraft's authority more reasonable is entirely misplaced. Haggiag knew only of the Bank of New York transaction, a purported guarantee by Anaconda of a $5,000,000 loan by that bank to Robin. Haggiag stated that "[i]f they [Bank of New York] could give $5,000,000, I could give an extension for $500,000." (Haggiag Dep. at 81). But Haggiag knew next to nothing about the terms of the Bank of New York transaction and made no effort to discover them. In fact, the circumstances of that transaction differed materially from those accepted by GOF; the bank refused to rely upon Article 9, and insisted on a note repurchase agreement as well as an opinion of Anaconda's counsel that Kraft had authority to sign such an agreement.

Haggiag did not, as he claims, get "the same guarantee as the Bank of New York," see *id.* at 68, and did not have commensurate evidence of Kraft's authority.

In fact, the only transaction involving Kraft and Reisini of which Haggiag had any detailed knowledge should have alerted him to the importance of requiring a board of directors resolution demonstrating express authority for a corporate officer to execute a guarantee of an unrelated third party's debt. Two months before Haggiag's first business contact with Kraft, Reisini asked Haggiag if he would introduce him to one of Haggiag's banks for the purpose of securing a loan to Robin with the guarantee of Anaconda. Haggiag spoke with his banker at Swiss Bank of Basle and the banker expressed interest in the transaction. (*Id.* at 99; Def.Mem. at 9) Reisini then asked Haggiag to introduce Kraft to the bank, so Haggiag arranged a visit with an officer of the Swiss Bank Corporation in New York City. (Haggiag Dep. at 100) According to Haggiag:

> Kraft came with me downtown and I introduced him because he wanted to borrow money with the guarantee of Anaconda from the Swiss Bank Corporation.... He showed certain documents of his and then they were supposed to meet, he was supposed to bring other documents. *They asked a specific Board of Directors' approval* and Kraft said he

4. Plaintiff's Reply Memorandum argues that Anaconda should have discovered the frauds of Kraft prior to the GOF transactions. (*See* P. Reply Mem. at 12–17). The argument is in the nature of a negligence claim, and was effectively pursued by some of the banks with whom Kraft dealt. But it is unavailable to GOF, since all the events that could arguably prove negligence occurred long after the loan agreement between GOF and Robin was extended in December 1976, pursuant to Kraft's promise to provide a guarantee. Even the final demand note for $300,000, the subject of this action, was signed in March 1978. The incidents that arguably could have constituted negligence by Anaconda, or ARCO, of which Anaconda is a subsidiary, occurred after the summer of 1978, when transactions came to light which Kraft was asked to, but could not, explain. The evidence of Anaconda's and ARCO's conduct before the summer of 1978 is insufficient to estab-

lish negligence. Thus, Faulkner's testimony that as early as 1972 he informed Anaconda's legal department that he suspected Kraft was "moon lighting" is insignificant. In 1977, ARCO's Treasurer, Thompson, inquired whether Wells Fargo had a relationship with Anaconda, and received an "evasive" reply from Kraft. In retrospect, that reply could be said to reflect Kraft's guilty mind. But Thompson had no reason to suspect any wrongdoing. Finally, in early 1978, Faulkner received a charge for a letter of credit from Bankers Trust Co. concerning a loan to Robin. Faulkner asked Kraft to find out about the charge, and Kraft assured him it was a mistake. Bysshe, an officer of Bankers Trust who was handling Anaconda's business, confirmed to Faulkner that the entry was an error, thereby providing Faulkner with a reasonable basis for inquiring no further. *See* Faulkner Dep. at 156–160.

would do it and he was supposed to meet at the office of Anaconda between this and Kraft.

(*Id.* at 100–01 (emphasis added)). No second meeting took place, and Kraft never presented the Swiss bank with an approval by Anaconda's Board. Despite Haggiag's awareness of his own bank's insistence on board-of-directors approval, Haggiag went ahead without similar documentation. He chose to rely on Kraft's representations without inquiry, rather than on the sound practice suggested by his bank's demands.

A plaintiff "claiming reliance on [an] agent's apparent authority must not fail to heed warning or inconsistent circumstances." S. *Williston, supra*, § 277A, at 227; *see also, Strip Clean Floor Refinishing v. New York District Council No. 9*, 333 F.Supp. 385, 396 (E.D.N.Y.1971) (citing *Deyo v. Hudson*, 225 N.Y. 602, 614, 122 N.E. 635 (1919)). "The duty of diligence in ascertaining whether an agent is exceeding his authority devolves on those who deal with him, *not on his principal.*" *Strip Clean Floor Refinishing v. New York District Council No. 9, supra*, at 396 (citing *Riley v. Larocque*, 163 Misc. 423, 297 N.Y.S. 756 (1937)) (emphasis added); *accord, In re Lester*, 87 Misc.2d 717, 725, 386 N.Y.S.2d 509, 514 (1976). Moreover, the course of conduct pursued, with Haggiag's knowledge, by the Swiss Bank shows the weakness of plaintiff's assertion that further inquiry would have been futile because Kraft purportedly was the officer entrusted by Anaconda with producing evidence of its agents' authority.[5] The documentation requested by the Swiss Bank required authorization Kraft could not easily provide. By requiring it, that bank avoided the fate that befell GOF.

Thus, the circumstances presented by the record not only demonstrate an absence of apparent authority, they also show that GOF failed to satisfy its obligation under New York law of making a reasonable attempt to discover the actual scope of Kraft's authority. "The unperformed duty of inquiry may, and often does, make it impossible to rely upon any so-called apparent authority of an agent." *Franhan Distributors, Inc. v. New York World's Fair, 1939, Inc.*, 124 F.2d 82, 85 (2d Cir. 1941). "[A] principal will not be bound by the act of his agent in excess of his actual authority where the facts and circumstances are such as to put the person dealing with the agent upon inquiry as to the power and good faith of the agent." 2 N.Y. Jur.2d, Agency, § 74, at 523 (1979); *accord, Angerosa v. White Co., supra*, 248 A.D. at 432, 290 N.Y.S. at 214, *Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 24–25 (2d Cir. 1974). Haggiag made no investigation of the circumstances of Anaconda's guarantee. He did not engage counsel. His purported "consultation" with an attorney consisted of showing the papers for a few moments to a lawyer he neither knew well nor retained.[6] He regarded the assurances of his brother and friends as sufficient. In his deposition, Haggiag explains, "I just said what business do you have with Anaconda, not because I want to find out, and he [Reisini] said they make curtain walls.... That's the only thing I remember." (Haggiag Dep. at 82). Haggiag's failure to discharge his duty to inquire about the scope of Kraft's authority is demonstrated by his vague knowledge of Anaconda's ostensible

---

5. Plaintiff has produced no evidence that Haggiag was even aware of this fact at the time of the transactions.

6. Haggiag's claim that he relied upon the opinion of a well-known attorney who happened to be present at a meeting is further evidence of Haggiag's lack of care, rather than proof that he acted reasonably. Haggiag says that he showed the visiting attorney the letter of guarantee and the bylaw, and that the attorney read the papers and said everything appeared to be in proper order. A letter from the attorney involved is in the record by consent, and his recollection shows how vague was his opinion: "A hasty examination of the form may have led me to believe that the guarantees seemed to be in proper form...." P. Submission of July 6, 1981. The attorney was not retained, or even consulted in any formal sense; he does not recall the event beyond stating that his examination was "hasty" and that it may have led to a belief that the documents "seemed" in proper form. Of course, he was under no obligation to Haggiag to exercise any degree of care, and Haggiag appears to have received advice commensurate in value with what he paid.

motive for executing the guarantee. The novelty of this transaction—a corporation's guarantee of an unrelated third party's debt to a film company not in the business of lending—warranted scrutiny of its circumstances, including Anaconda's motive for guaranteeing the loan and the security Anaconda obtained for the guarantee.

The evidence in the record fails to establish that Anaconda through its conduct misled plaintiff so as to warrant a finding that Kraft had "apparent authority" to bind Anaconda to the guarantee. Indeed, Haggiag's negligence, not Anaconda's, precipitated the loss. Accordingly, judgment shall be entered for the defendant Anaconda, with costs. The case will be closed without prejudice to reopening against Robin after the stay occasioned by Robin's involuntary bankruptcy proceedings is lifted.