In re 1981 EQUIDYNE PROPERTIES, I, Debtor.

OFFICIAL LIMITED PARTNERS COMMITTEE OF 1981 EQUIDYNE PROPERTIES, I on Behalf of 1981 EQUIDYNE PROPERTIES, I, Debtor, and the Limited Partnership of the Debtor, Plaintiff,

v.

CREDIT ALLIANCE CORPORATION, Defendant.

Bankruptcy No. 83 B 11191 (PA). Adv. No. 84–6159A.

United States Bankruptcy Court, S.D. New York.

April 25, 1986.

Munves, Tanenhaus & Storch, New York City, for Official Ltd. Partners Committee.

Ballon, Stoll & Itzler, New York City, for Credit Alliance Corp.

## MEMORANDUM DECISION

PRUDENCE B. ABRAM, Bankruptcy Judge.

This case pits the Limited Partners (the "Limited Partners") of 1981 Equidyne Properties, I ("Equidyne") against Credit Alliance Corporation ("Credit Alliance"), the holder of a $850,000 junior mortgage and the assignee of a $9.8 million wrap-around mortgage (the "Wrap Mortgage") on the sole asset of the partnership, the Morris County Mall (the "Mall"). At issue is the validity of the $850,000 mortgage (the "Junior Mortgage").[1] The Limited Partners urge that Equidyne Properties, Inc. ("Properties"),[2] the general partner of Equidyne, lacked both the actual and apparent authority to consent to the placing of the Junior Mortgage on the Mall and that the Junior Mortgage is therefore invalid. It is undisputed that the proceeds of the Junior Mortgage were not paid to the partnership. The proceeds were paid to the order of the then holder of the Wrap Mortgage, Eastland Properties, Inc. ("Eastland"), who pledged the Wrap Mortgage to Credit Alliance as part of the transaction.

This appears to be a case of first impression. In any event, neither side has pointed the court to any case dealing with the actual or apparent authority of a general partner to consent to the placing of a sen-ior and included mortgage on property subject to a wrap-around mortgage.

The Limited Partners are correct that the Junior Mortgage if it stood alone, would be voidable as beyond the scope of the general partner's actual or apparent authority to bind the partnership because the loan proceeds did not go to the partnership and would have resulted in the pledge of partnership property for the debt of another. See *Chelsea National Bank v. Lincoln Plaza Towers Associates*, 461 N.Y.S.2d 328, 93 A.D.2d 216 (1st Dept.1983). However, the Junior Mortgage does not stand alone. It stands as an included mortgage in the Wrap Mortgage, which provides that its holder is to receive the proceeds of senior mortgages. Conceptually, the Junior Mortgage did not result in the pledge of partnership property for the debt of another because the Junior Mortgage was included within the scope of the pre-existing lien of the Wrap Mortgage.

For the reasons which follow, the court has concluded that Properties had the apparent authority to consent to the placing of the Junior Mortgage and that it is therefore valid and enforceable. As the matter is in doubt and of importance principally for reasons unrelated to the present dispute, the court declines to reach the issue of Properties' actual authority to consent to the Junior Mortgage. Likewise, the court need not address at this time the effect of its present holding on the Wrap Mortgage, Eastland or Properties.

Equidyne, which was formed in or about mid-1980, was one of a series of so-called tax shelter real estate limited partnerships formed and promoted by Stuart Ross ("Ross") and Joel Beeler ("Beeler").[3] Capi-

---

1. Not in issue at the present time is the computation of the amount now due and payable on the Junior Mortgage.

2. An involuntary petition was filed against Properties on October 1, 1984, by certain of the limited partners of this partnership and of another similar partnership. By decision and order dated April 18, 1986, this court granted Properties' motion to dismiss the involuntary petition on the grounds the petitioners were not the holders of claims not the subject of a bona fide dispute.

3. Ross and Beeler were also involved in business ventures in other areas as well and utilized a number of different entities to conduct the various business enterprises. Ross and Beeler ceased their business relationship in or about October 1982. Beeler was still associated with Ross at the time of placement of the Junior Mortgage.

tal raised through the sale of the limited partnership units was used to purchase the Mall from Eastland[4] for $12,250,000. The purchase price was paid partly in the form of the Wrap Mortgage which was retained by Eastland, as seller of the Mall. Eastland acquired the Mall from an unrelated third party for the purpose of reselling it to Equidyne I.

The Wrap Mortgage Note ("Wrap Note") requires payments of interest only at the rate of 16% ($1,568,000 per annum or $130,666.66 per month) for the period January 1, 1981 through November 1, 1985. Thereafter the Wrap Note provides that payments of $61,150 per month are to be made and applied first to payment of current interest at 6% per annum with the balance to be applied in reduction of principal. Under the terms of the Wrap Mortgage, Eastland covenanted to make payments on the two prior mortgages, one in the approximate amount of $6.5 million held by Travelers Insurance Co. and one in the amount of $1.2 million held by the prior owner of the Mall. Although Eastland covenanted to make payments on the prior and included mortgages without regard to whether it had received payment from Equidyne as the fee owner, both the stated payments due under the Wrap Note and the expected payments based on available revenues were sufficient to cover payments on the included mortgages.

As the financial information contained in the offering memorandum for the Equidyne limited partnership interests makes apparent, the expected income from the Mall would be insufficient in fact to allow for payment in full of the stated amounts due under the Wrap Note. The Wrap Note provides that to the extent not paid, interest shall accrue. Although the Wrap Note does provide for interest accrual, it does not contain any provision in the Wrap Note limiting payments due to the income available from the Mall.[5] The Wrap Note further provides that for any year after 1985, to the extent cash flow, as defined in the Equidyne partnership agreement, exceeded $206,250 additional payments are due to the extent of the excess to be applied in reduction of interest accrued in prior periods. Structuring of large interest payments on the Wrap Note during the early years enhanced the tax advantages to the holders of limited partnership interests. The Wrap Mortgage permits its holder to place additional included mortgages on the property providing stated limitations on aggregate debt service are met, and retain the proceeds of the new mortgages.[6]

---

4. Eastland was part of the Ross-Beeler group.

5. It would be possible to construe the accrual provision in such a fashion that the Wrap Mortgage holder could never foreclose because there could never be a payment default as any missed payment would automatically accrue. The obligation of good faith probably would preclude this result. However, it can easily be urged that the wrap mortgagee's failure to protest any non-payment prior to the next month's due date results in accrual of the "missed payment" on the grounds of implied consent to accrual. Whether a more explicit clause on the accrual provision would have jeopardized the tax treatment of the accruals is unnecessary for this court to resolve at this time.

Beeler's after-the-fact letter of November 9, 1982 to an attorney containing his understanding of the various partnership documents must give way to the language of the documents themselves. In the letter, Beeler states that Equidyne's obligation to pay debt services to Eastland is limited to $733,800 per year until 1985. Such an express limitation nowhere appears in the Wrap Mortgage or Note. At trial,

Beeler testified that he consulted the Wofsey Firm respecting the proposed Credit Alliance transaction because he was uncertain whether it was authorized under the Wrap Mortgage.

6. The Wrap Mortgage provides that its holder can

"37. Subject to the conditions hereinafter set forth in paragraphs (i) through (iv) below, Mortgagee may, at its sole option, at any time and from time to time, cause to be placed on the Premises one or more mortgages (referred to individually and together with a refinanced or replaced Prior Mortgage as a "Senior Mortgage"), and may at its sole option, at any time and from time to time, refinance (which shall mean extend, modify, replace, increase, refinance, or consolidate (including without limitation, a consolidation with this Mortgage) any Senior Mortgage), and this Mortgage shall be subject and subordinate to any Senior Mortgage.

"The conditions of a Senior Mortgage are as follows:

"(i) All proceeds, if any, shall be the property of the Mortgagee; shall not be deemed to

In or about June 1981, Ross and Beeler sought to borrow money from Credit Alliance secured by the Mall. Ross and Beeler as owners of the Wrap Mortgage through Eastland were free to assign or sell it.

Credit Alliance has a portfolio in excess of $100 million consisting principally of loans secured by machinery. Although Credit Alliance as an organization has little experience in loan transactions involving real estate, its president, Clarence Palitz, has extensive personal experience in real estate investments and is knowledgeable in the area of shopping centers.

By letter dated July 17, 1981 addressed to "Mr. Stuart Ross, President, Equidyne Properties, Inc." Mr. Palitz set forth the terms on which Credit Alliance would consider making a loan. The letter states that based on the annual cash flow of $206,000 ($17,000 per month) available to service a second mortgage that Credit Alliance would consider an $800,000 second mortgage. Mr. Palitz stated that he would consider recommending a term of up to 3 years, payments would be $17,000 per month including interest, with interest at 3½% over prime. There would be a discount charge of 5%. Mr. Palitz also stated that, if preferred, Credit Alliance could issue a letter of commitment and stated terms for that. The letter also states that any loan or commitment would be subject to a thorough and satisfactory analysis of the property, documentation satisfactory to counsel, an opinion relative to ownership of the property and its freedom from encumbrances other than the first mortgage, a title policy, and certain warranties concerning income, expenses, terms of leases and the like. It was also stated that the first mortgage either needed to be assumable or an appropriate mechanism established to keep it current.

Credit Alliance's in-house counsel, Jack Levine, is not experienced in the real estate area, although he has extensive experience in the types of secured lending traditionally done by Credit Alliance. Mr. Levine was in charge of seeing that the legal work for the loan was accomplished. Because of his own lack of expertise, Mr. Levine determined that Credit Alliance required an opinion from outside counsel and that it should obtain a title insurance policy.

At the recommendation of Mark Schwarz, then a partner in the law firm of Wofsey, Certilman, Haft & Lebow firm (the "Wofsey Firm"), counsel for Ross and his enterprises, Mr. Levine engaged L. Robert Lieb as counsel for Credit Alliance in order to obtain an opinion as to the validity of the security to be received. Mr. Lieb is licensed to practice law in New Jersey, where the Mall is located. At the time in question, Mr. Lieb was engaged in the practice of law. He has since ceased to practice law in order to concentrate on his own real estate investments. Mr. Lieb is a knowledgeable real estate attorney.

Mr. Lieb advised Credit Alliance that it would take a month or six weeks to do the due diligence required for him to render an opinion on the authority of Equidyne to grant the Junior Mortgage. Ross and Beeler did not wish to wait that long to obtain the loan proceeds. As a result of discussions among the various parties, it was agreed that Mr. Lieb could rely in his opinion on the opinion of the Wofsey Firm as to the authority of Equidyne to grant the Junior Mortgage.

---

reduce the principal amount of this Mortgage, or to reduce, abridge or postpone the obligation of the Mortgagor to make the regular payments set out in the note evidencing the indebtedness secured hereby and shall be paid to the Mortgagee, in consideration of the covenant of the Mortgagee herein contained to make all payments of principal and interest payable pursuant to the Senior Mortgage as hereinabove provided, except that the aggregate of the unpaid principal balance on any Senior Mortgage shall not exceed the then unpaid principal balance secured by this Mortgage.

"(ii) The aggregate annual charges for interest and amortization (if any) on the Senior Mortgage, shall not at any time exceed the aggregate annual charges for interest and amortization then payable under the Mortgage, and the Senior Mortgage shall amortize in such manner so that the aggregate unpaid principal balance thereof shall not at any time be greater than the unpaid principal balance of this Mortgage from time to time."

Mr. Lieb testified at trial that in his judgment the authority of Equidyne to execute the Junior Mortgage was central to its validity. He placed little importance on the terms or limitations in the Wrap Mortgage and Note itself because in his view the consent of the owner of the fee interest would override any such terms or limitations.[7] Mr. Lieb did review the Wrap Mortgage and Note but he did not review the Equidyne partnership agreement or the offering memorandum.

Under date of August 18, 1981, Mr. Schwarz on behalf of the Wofsey Firm signed an opinion letter (the "Wofsey Opinion") addressed to Credit Alliance relative to the Junior Mortgage. The Wofsey Opinion states:

> "We have acted as counsel to the Borrower, and to the Partnership and the Guarantors (as hereinafter defined) in connection with (i) the $850,000 note ("Note") of even date from the Borrower to you, (ii) the mortgage (the "Mortgage") made by the Borrower and by 1981 Equidyne Properties-I (the "Partnership") which secures the obligations of the Borrower under the Note." * * *
>
> "[W]e are of the opinion that:
>
> "1. The Borrower and the Partnership, * * * have all requisite power and authority to carry out the terms of the Loan Documents.
>
> "2. The Loan Documents * * * have been duly and validly executed and delivered by their respective signatories and constitute legal, valid and binding obligations of each signatory in accordance with their terms * * * The Mortgage constitutes a valid lien securing payment of $850,000 * * *."

At trial, Mr. Schwarz testified that the Wofsey Firm was acting only on behalf of Eastland in the Credit Alliance transaction. He testified as follows in that regard:

> "What this [the Wofsey Opinion] says is that we are counsel to the borrower in

this transaction and have acted as counsel to the partnership. It's a disclosure, is really what it is. In this transaction we acted as counsel to the borrower, which was Eastland.

> "Q. Now, your testimony is you are only acting on behalf of Eastland in this transaction.?
>
> "A. That's correct. We performed no services for the partnership in this closing." Transcript, 11/16/84 at 250–251.

Mr. Schwarz did not recall whether the Wofsey Opinion was delivered to Mr. Lieb at Mr. Lieb's request. Mr. Schwarz stated that he did not know or recall whether Mr. Lieb was relying on the Wofsey Opinion. Mr. Schwarz did not recall whether there was counsel for the partnership in the loan transaction. In connection with his opinion on the partnership's authority, Mr. Schwarz stated that he had examined the certificate of incorporation and the bylaws of the general partner and the partnership agreement of the partnership. He stated that he had also examined the Wrap Mortgage to determine whether Eastland and the partnership had the requisite power and authority to carry out the terms of the loan transaction. In his view, the stated interest payments were the controlling limitation, not the lesser amount actually being paid. He stated that he had probably not relooked at the original limited partnership offering memorandum, which he had drafted, because he did not consider it relevant to the partnership authority issue.

This court finds that the Wofsey Firm held itself out as representing Equidyne and its general partner, Properties, as well as Eastland, in the transaction. The court further finds that the Wofsey Firm knew that Credit Alliance and Mr. Lieb intended to rely on the Wolfsey Firm's opinion as to Equidyne's authority to execute the Junior Mortgage. Mr. Schwarz' explanation of the reference to representation of the Part-

---

7. Mr. Lieb's testimony about his lack of concern for the terms of the Wrap Mortgage cannot be equated with a lack of concern for its existence. It is evident from the fact that Mr. Lieb re-

viewed the Wrap Mortgage that he considered its existence relevant to the proposed transaction. Indeed, it was the predicate of the transaction and taken as a given by Mr. Lieb.

nership as a disclaimer about past representation is linguistically, factually and transactionally incredible. The Wofsey Opinion contains no disclaimers or statements respecting possible conflicts, even though Mr. Schwarz was himself a limited partner in the Partnership and there was an apparent conflict of interest between Equidyne and Eastland relative to the creation of new senior debt under the Wrap Mortgage.

■ Credit Alliance acted with reasonable legal prudence in the transaction. The court does not find Credit Alliance's reliance on the Wofsey Firm's opinion as to Equidyne's authority unreasonable even though the Wofsey Firm had a potential conflict by virtue of its representation of the Wrap Mortgage and the partnership. The mere existence of a potential conflict does not render Credit Alliance's reliance unreasonable per se. Indeed, at the outset of this partnership, the Limited Partners relied on the opinion of the Wofsey Firm, even though the firm had disclosed conflicts of interest. Credit Alliance secured its own opinion from competent outside legal counsel. Mr. Lieb knew Mr. Schwarz from prior matters. Mr. Lieb's legal view as to relative importance of the consent of the owner versus the terms of the Wrap Mortgage was reasonable. There was no showing at trial that it was a violation of custom and usage or of existing standards of good practice for a lender to rely on an opinion of reputable counsel representing the borrower as to due authority. Moreover, it would unnecessarily enhance the transactional costs of lending to insist that a lender must always obtain its own opinion on due authority when dealing with a

partnership. Furthermore, Credit Alliance obtained title insurance for its mortgage.[8]

Credit Alliance also conducted a reasonable factual investigation and review of the Mall itself. Mr. Palitz personally inspected the Mall and recorded his findings in a memorandum. Credit Alliance fixed the amount of the loan at an amount that Credit Alliance determined could be serviced from the Mall's actual income and not merely an amount which could be serviced from the theoretical payments due on the Wrap Note. It is uncontradicted that at the time the mortgage was placed that Credit Alliance intended to roll over the Junior Mortgage at the end of the term if the payment history was satisfactory. Moreover, it appears that Credit Alliance would not have made the loan if it had not believed it would be paid at maturity.

Mr. Schwarz expressed the view at trial that he had no obligation to determine what amounts were actually being paid by the partnership to Eastland and that it was Credit Alliance's problem whether the payments could be made. This view is unduly cavalier as the due authority opinion required both a factual and legal analysis since, at the least, a serious question existed whether the payments required by the Junior Mortgage exceeded the limitations contained in the Wrap Mortgage. Only if the payments on the proposed Junior Mortgage were within the Wrap Mortgage limitations was the general partner obligated to consent to the placing of the senior lien.[9] Conversely, if the payments exceeded those limitations, the general partner was under no obligation to consent. If Equidyne was under no obligation to consent, then the giving of consent was an exercise of discre-

8. The title insurance policy, a copy of which was placed in evidence, insures against loss or damage sustained or incurred by reason of the invalidity or unenforceability of the insured mortgage upon the estate except to the extent that such invalidity or unenforceability, or claim thereof, arises out of the transaction evidenced by the insured mortgage and is based upon (a) usury, or (b) any consumer credit protection or truth in lending law. Seemingly, Credit Alliance would be insured against this court's finding the Junior Mortgage invalid on the grounds of lack of authority. A representa-

tive of the title insurance company testified at trial that the company had issued only a very few policies on junior, included liens.

9. In ¶ 37 of Wrap Mortgage, Equidyne agreed that without charge it would execute, acknowledge and deliver on demand all notes, mortgages and other documents the mortgagee, Eastland, deemed necessary to effectuate placement on the premises of a Senior Mortgage, as defined in the Wrap Mortgage.

tion by the general partner and an assessment had to be made as to the scope of authority and the propriety of the exercise of discretion.[10] The general partner would have breached its fiduciary duty in consenting to a senior mortgage that required payments in excess of any apparent sources of repayment. The propriety of the general partner's consent might also turn on whether any direct or indirect benefit was to be received by Equidyne from the loan proceeds.

The Limited Partners urge that Equidyne was not required to consent because the payments due on the Junior Mortgage exceeded the limitations for senior debt contained in the Wrap Mortgage. The Junior Mortgage provided for monthly payments of $17,000 with a balloon of approximately $850,000 at the end of one year. The total payments, including interest and principal, required over the twelve-month life of the loan were approximately $1,054,000. As set forth earlier, the Wrap Mortgage provided for payments of $1,568,000 per year. Annual payments on the prior mortgage to Travelers were approximately $710,000. Thus, theoretically a new senior mortgage could require additional payments of $858,000 per year and not exceed the Wrap Mortgage limit. The payments required by the Junior Mortgage, if the principal payment at maturity is included, exceed this limit.

The actual amount that could be paid on the Wrap Note based on the income and expenses of the Mall was not in excess of about $916,000. After deduction of the Travelers mortgage payments, available cash flow to service a new included mortgage was in the neighborhood of $206,000. This amount would be enough to pay the interest on, but not the principal of, the Junior Mortgage.

■ As previously indicated, ¶ 37(ii) provides that the aggregate charges for interest and amortization on senior mortgages cannot exceed the aggregate annual charges for interest and amortization then payable under the Wrap Mortgage. The Limited Partners make the further argument that ¶ 37(ii) should be interpreted in light of the provision in the Note that interest accrued is not payable so that the aggregate interest and principal limitations would relate to the considerably lower amounts being paid. The court finds that construction strained, however, and finds this limitation of ¶ 37(ii), by itself, does not incorporate the payable/accruable distinction and thus fails to preclude a senior mortgage whose payments are based on the stated amounts due under the Wrap Note.

Paragraph 37(ii) also requires that the senior mortgage amortize in a manner such that the aggregate unpaid principal balance not be greater than the unpaid principal balance of the Wrap Mortgage. The Junior Mortgage does not appear to exceed this limitation.

■ These two provisions of ¶ 37(ii) deal with different aspects of refinancing limits. As this case illustrates, it is possible to meet one condition without meeting the other. Strictly adhered to, the limitations of ¶ 37(ii) would permit a larger amount of long-term refinancing and a smaller amount of short-term refinancing. The result of the Credit Alliance transaction for Eastland was that it permitted Eastland to borrow, in cash, the present value, roughly speaking, of the Wrap Mortgage. Refi-

---

**10.** Under the Equidyne partnership agreement, one of the purposes of the partnership was to own and to lien the Mall. Partnership Agreement ¶ 2.01(b). In addition, the partnership had the power to borrow money and issue evidences of indebtedness without recourse and to secure same by deed of trust, mortgage, pledge or other lien, in furtherance of any or all of its business and to enter into, perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accom-

plishment of these purposes. ¶ 2.02. The general partner was given the exclusive right, power and authority to manage, direct and control all of the affairs and business of the partnership. ¶ 6.01. The general partner was also specifically empowered to prepay, refinance, recast, consolidate, modify, renew or extend partnership obligations and mortgages or other instruments, in whole or in part concerning the partnership property. ¶ 6.02(b)(7).

nancing provisions are standard features of wrap-around mortgages. The court finds that Credit Alliance could have and did reasonably believe that Equidyne had the apparent authority to consent to the placing of the Junior Mortgage.

■ This case is governed by the legal principle that as between two parties injured by the acts of an agent, the loss shall fall on the agent's principal if the agent had apparent authority. The existence of apparent authority depends on proof that the third party relied upon conduct of the principal which clothed the agent with the appearance of authority. See *Chelsea National Bank, supra.* Here the Wrap Note and Mortgage and the partnership agreement provided that appearance of authority. The apparent authority of an agent to act on behalf of a partnership cannot be established by the acts of the agent. It is the obligation of the third party to make some effort to discover the actual scope of the agent's authority. See *Chelsea National Bank, supra.* A principal is not bound by the act of its agent in excess of his actual authority where the facts and circumstances are such as to put the person dealing with the agent upon inquiry as to the power and good faith of the agent. See *General Overseas Films, Ltd. v. Robin International, Inc.,* 542 F.Supp. 684, 695 (D.C.S.D.N.Y.1982). Here Credit Alliance made that effort. It retained its own knowledgeable real estate counsel. It obtained title insurance for its mortgage. It inspected the property and analyzed the property's actual cash flow. It relied on an opinion as to due authority from the Wofsey Firm, prepared by the person most familiar with the entire partnership legal structure, the very person who had prepared the partnership offering memorandum.

■ The proof at trial that Credit Alliance had knowledge that coal investments made by the Ross group were having financial problems at the time of the closing of the Junior Mortgage is insufficient to impose a duty of inquiry on Credit Alliance as to the power and good faith of the agent

beyond that conducted. Equidyne is a legally separate entity involved in a stand-alone real estate transaction that Credit Alliance had determined was economically viable. No other indicia have been shown which would have indicated the need for further investigation of good faith. Compare *General Overseas Films, Ltd., supra,* 542 F.Supp. at 695 ("Haggiag made no investigation of the circumstances of Anaconda's guarantee. He did not engage counsel. His purported 'consultation' with an attorney consisted of showing the papers for a few moments to a lawyer he neither knew well nor retained. He regarded the assurance of his brother and friends as sufficient.").

■ Although the court has sustained the validity of the Junior Mortgage, it finds the issues raised by the Limited Partners over the propriety of the Junior Mortgage to be serious and important ones which are deserving of a careful and thoughtful analysis. However, in a case of first impression, it would be unduly harsh for the court to require a party's conduct to measure up to that ideal which, with the wisdom of hindsight, would have been appropriate. Future lenders cannot afford to take solace in this court's decision in favor of Credit Alliance. This court finds a bright line separating cases where consent of the fee owner is mandated in the wrap mortgage from those where it is not. A further bright line divides those situations in which there is a close legal relationship between the wrap mortgagee and the fee owner (other than merely the typical mortgagor/mortgagee relationship) from those where there is not. Enhanced scrutiny ought to be required when consent is not mandatory and/or where there is a close legal relationship. This court's decision, looking as it does to the totality of the circumstances, offers uncertain guidance, instead of predictability, for those looking to conform their future conduct to existing legal standards. Predictability would be desirable. More careful drafting of the various documents would be of assistance. For example, the outcome of this case

would have been different if the Equidyne partnership agreement had expressly precluded the general partner's consent to an included lien that did not meet the mandatory consent guidelines in the Wrap Mortgage. An expression in the Wrap Mortgage that the fee owner need not consent, except when consent is mandatory, unless the limited partners expressly agree to a particular refinancing because of the potential impact on the limited partners' position might be desirable in light of the necessarily limited participation that limited partners may take in the management of a partnership. See N.Y.Partnership Law, § 96. At a minimum, enhanced representations and warranties of the borrower should be required by the lender at the closing of a non-mandatory consent mortgage. In addition, when the Wrap Mortgage and the fee owner are legally intertwined, the lender should consider the possibility of insisting that an opinion be obtained relative to the consent of the fee owner from counsel which is not also representing the borrower-wrap mortgagee. In the final analysis, however, it is the burden of the limited partners to insure that the partnership agreement contains appropriate, explicitly worded limitations on the general partner's authority.

Credit Alliance is directed to settle an appropriate order in accordance with this opinion.