**ALICIA OCEAN TRANSPORT, S.A., BMF Ocean Transport, S.A., Emily Ocean Transport, S.A., Barbara Ocean Transport, S.A., Sonia Ocean Transport, Ltd., Menya Ocean Transport, Ltd., RMF Ocean Transport, S.A. and Benyomin Ocean Transport, Ltd., Plaintiffs,**

v.

**ROLLINS BURDICK HUNTER OF NEW YORK, INC., Defendant and Third-Party Plaintiff,**

v.

**EQUITY STEAMSHIP AGENCIES, LTD., Third-Party Defendant.**

No. 83 Civ. 9309 (LFM).

United States District Court,
S.D. New York.

Nov. 5, 1985.

Milgrim Thomajan Jacobs & Lee, P.C. by George Graff and Emily Tabin, New York City, for plaintiffs.

Lambos, Flynn, Nyland & Giardino by Philip V. Moyles, New York City, for defendant and third-party plaintiff.

Dickerson, Reilly & Mullen by Robert W. Mullen, New York City, for third-party defendant.

**1.** It is stipulated that the loss payable clause in each hull policy provides as follows:

## OPINION

MacMAHON, District Judge.

This is an action by eight former owners of eight seagoing vessels against a marine insurance broker, Rollins Burdick Hunter of New York, Inc. ("RBH"), to recover $242,822.57 in insurance proceeds. Plaintiffs allege that RBH received the proceeds and either wrongfully paid them to Equity Steamship Agencies, Ltd. ("Equity"), the former general managing agent of plaintiffs' vessels, or wrongfully withholds them. RBH denies liability but seeks indemnification from Equity if plaintiffs recover. The action was tried before us, without a jury, on September 19 and 20, 1985.

## JURISDICTION

The court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1332 and 1333.

## FACTS

After carefully considering the exhibits, hearing and observing the witnesses, and weighing all the evidence and arguments of counsel, we find the following facts:

Each of the eight plaintiff corporations purchased a seagoing vessel between September 1979 and February 1981 and, pursuant to eight essentially identical agreements ("Management Agreement"), retained Equity as managing agent. The Management Agreement gave Equity virtually complete authority to maintain, repair, operate and charter each vessel.

In accordance with its obligation to obtain "all necessary insurances," Equity obtained hull insurance policies for all eight vessels through defendant RBH. Although both plaintiffs and Equity are named assureds, the loss payable clauses provide for payment either directly to the repairer or to the shipowner as reimbursement for its payment for repairs.[1]

"Losses, if any, other than those arising out of an actual or constructive total loss or a compromise constructive total loss or a requi-

During the two years that Equity was managing agent for plaintiffs, several insurable losses were suffered by the vessels, including the constructive total loss of one vessel, OCEAN ENDEAVOR. Most of the proceeds from these claims were paid by RBH.

On December 10, 1981, however, all of plaintiffs, except Benyomin Ocean Transport, Ltd., whose vessel, OCEAN ENDEAVOR, suffered a constructive total loss a year earlier, sold their vessels to corporations controlled by Captain John Emmans, the president of Equity. After the sale, there still remained unpaid insurance claims for casualty losses suffered before the sale. RBH ultimately paid the proceeds on these remaining claims to Equity, but Equity refused to remit to plaintiffs, offsetting them as credits against unpaid trade debts owed to Equity by plaintiffs.[2]

Plaintiffs now seek to recover $242,822.57 in insurance proceeds from RBH, contending that plaintiffs were the sole loss payees under the applicable marine insurance policies and that Equity was not authorized to receive the payments on plaintiffs' behalf.

## DISCUSSION

The central issue here is one of agency. Did RBH's payments to Equity constitute payments to plaintiffs?

*Equity's Authority as Plaintiffs' Managing Agent*

■ Equity agreed under the Management Agreement[3] to act as general manager of plaintiffs' vessels and was required to procure all necessary insurance on them. There is no question that Equity also had authority, as managing agent, to process insurance claims on behalf of the shipowners, including collection of insurance proceeds.

A managing agent's authority to receive payment on behalf of his principal is implied by virtue of the comprehensive duties a managing agent undertakes in the execution of his principal's business. The Restatement (Second) of Agency makes this clear:

"Unless otherwise agreed, authority to manage a business includes authority:

\* \* \* \* \* \*

(e) to receive payment of sums due principal and to pay debts due from the principal arising out of the business enterprise."[4]

Indeed, plaintiffs themselves have recognized Equity's authority to collect insurance proceeds on their behalf. Rob-Felzenberg ("Felzenberg"), president of all eight shipowning companies, admitted at trial that Equity had authority to process insurance claims and to receive the proceeds as they were honored.[5]

■ Plaintiffs contend, however, that Equity's agency terminated under Section

---

sition, shall be payable directly for the repair or other charges involved, or if Shipowner shall have first fully repaired the damage and paid for the salvage and other charges, shall be payable to Shipowner as reimbursement therefor provided, however, if the Mortgagee shall have notified the Assurer that an event of default under the Mortgage shall have occurred and is continuing, then said losses shall be payable to the Mortgagee for distribution by it first to itself and then to Shipowner as their respective interest may appear, and, in the event of an actual or constructive total loss or compromise constructive total loss or a requisition shall be payable to Mortgagee for distribution first to itself and then to Shipowner as their respective interests may appear."

**2.** In fact, Equity claims that even with the retention of these proceeds, plaintiffs are indebted to it in an amount exceeding $400,000.00.

**3.** Section 18 of the Management Agreement provides that the agreement is to be construed and interpreted according to New York Law. Plaintiffs' Exhibit 1.

**4.** Restatement (Second) of Agency § 73 (1958); *see also Hedman v. Security Guarantee Co.,* 245 App.Div. 224, 227, 281 N.Y.S. 565 (3d Dep't 1935) ("authority to manage a business includes authority to receive payment of sums of money due the principal."); 1 Mechem on Agency § 996 (2d ed. 1914).

**5.** Trial Transcript ("Tr. ＿＿＿") at 138.

16 of the Management Agreement when a vessel was either declared a constructive total loss or was sold. Plaintiffs argue, therefore, that Equity's authority as managing agent terminated with respect to OCEAN ENDEAVOR when she was declared a constructive total loss on October 25, 1980, and, with respect to the remaining seven vessels, on December 10, 1981, when they were sold.

We do not accept such a limited reading of the Management Agreement. The "termination clause," Section 16, provides in part:

"[T]his Agreement shall terminate in the event and as of the date the Vessel may be declared a total or constructive total loss by underwriters ... or the Vessel may be sold. *Upon termination of this Agreement, the Manager shall perform all services necessary to terminate or otherwise settle all transactions arising with respect thereto during the period of this Agreement, and the Manager shall be entitled to reimbursement of all expenses of winding up the business of the Vessel.*" (Emphasis supplied.)

The Management Agreement thus expressly provided for Equity's continued services in "winding up" the unfinished business and affairs of the vessels and made provision for compensation for those services. Equity's authority as managing agent therefore continued after the constructive total loss of OCEAN ENDEAVOR and the sale of the remaining vessels respecting transactions arising prior to those events. The continued processing of insurance claims and receipt of the proceeds clearly fell within Equity's express contractual authority and obligation to wind up the business of the vessels.

Moreover, Equity informed plaintiffs that it intended to apply any insurance proceeds received for plaintiffs' account against the outstanding trade debts plaintiffs still owed to Equity,[6] and sent a series of letters to that effect to Felzenberg over the course of 1982.[7] Felzenberg did not object to this arrangement and many insurance payments were received by Equity from RBH during 1982 and credited to plaintiffs' account.

Thus, plaintiffs knew Equity was collecting insurance proceeds from RBH but continued to permit Equity to hold itself out to RBH as plaintiffs' authorized managing agent. These circumstances created apparent authority in Equity to act on plaintiffs' behalf.[8]

We conclude that Equity had express, implied and apparent authority to receive insurance proceeds on plaintiffs' behalf.[9]

Plaintiffs contend that they should recover from RBH all payments made when

---

**6.** Tr. 194–95.

**7.** Defendant-Third-Party Plaintiff's Exhibits B (letter of 4/28/82 to Felzenberg); D (letter of 6/16/82 to Felzenberg); and E (letter of 10/12/82 to Felzenberg).

**8.** *See Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 665 (2d Cir.1964) ("Apparent authority ... arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess"); *General Overseas Films, Ltd. v. Robin Intern., Inc.,* 542 F.Supp. 684, 688–89 (S.D.N.Y. 1982), *aff'd,* 718 F.2d 1085 (2d Cir.1983) (doctrine of apparent authority rests on the acts or omissions of the principal); *Ford v. Unity Hospital,* 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973) (doctrine of apparent authority involved when principal's own conduct permits agent to mislead third party); Restatement (Second) of Agency § 27 (1958).

**9.** It appears that plaintiffs' silence in the face of Equity's professed plan to keep the insurance proceeds as payment for unpaid trade debts also constituted a ratification of Equity's acts. Section 94 of the Restatement (Second) of Agency states:

"An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it."

Restatement (Second) of Agency § 94 (1958); *see also* Restatement (Second) of Agency § 94 comment a (1958) ("silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent can be inferred"); Restatement (Second) of Agency § 94 comment b (1958) ("Acquiescence can be inferred from silence, even though the purported agent was therefore a stranger to the purported principal"); *Columbia v. Lee,* 243 App.Div. 361, 366, 277 N.Y.S. 161 (2d Dep't 1935).

plaintiffs notified RBH after March 1983 to stop paying Equity. We find no relevance in this contention because it ignores the relationship of creditor and debtor that existed between Equity and the shipowners. Such notice to RBH does not alter the essential fact that plaintiffs actually received payment in the manner they had previously agreed upon with Equity.

It is clear from the evidence at trial that plaintiffs are indebted to Equity for various trade debts Equity incurred in the operation and management of plaintiffs' vessels. Captain Emmans' uncontradicted testimony at trial established that he and Felzenberg agreed that Equity would receive the remaining proceeds and credit them against the outstanding trade debts owed to Equity.[10] Further, Equity's accountant, William Catalina, testified that plaintiffs' account was in fact credited with the proceeds as received.[11]

Plaintiffs offered no evidence at trial contradicting this payment arrangement or showing that their account was not properly credited. When Equity credited plaintiffs' account with the insurance proceeds, plaintiffs in effect received payment in accordance with their own direction and consent.[12]

We hold that the insurance proceeds paid by RBH to Equity constituted payment to plaintiffs as loss payees under the applicable policies of marine insurance.[13]

The foregoing opinion constitutes this court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R. Civ.P.

The Clerk of the court is directed to enter judgment in favor of defendant and third-party plaintiff, Rollins Burdick Hunter of New York, Inc., dismissing the action with prejudice.

---

**10.** Tr. 194–95.

**11.** Tr. 214–15.

**12.** *Harrold v. Commissioner of Internal Revenue,* 232 F.2d 527, 529 (9th Cir.1956) ("In law, payment may just as effectively be made by offset or credit"); *General Electric Credit Corp. v. Contrucci,* 332 F.Supp. 827, 830 (W.D.Pa.1971); *Seaboard Surety Co. v. H & R Construction Corp.,* 153 F.Supp. 641, 649 (D.Minn.1957); 70 C.J.S. Payment § 32 ("When so agreed or consented to payment may be made by the transfer of debits or credits or the application of deposits or funds of the debtor in the hands of the creditor. . . .").

**13.** Plaintiffs make much of the fact that RBH paid the disputed claims with checks payable solely to Equity and that Equity had no authority to receive payment in its own name. Plaintiffs' Pre-Trial Memorandum at 7. We are not persuaded by this argument. The fact remains that Equity was impliedly authorized to collect payment of insurance proceeds and was, in addition, held out as such to RBH. Felzenberg himself admitted at trial that Equity was so authorized. *See* Tr. 138.

New York cases that have dealt with the problem of a general agent's receipt of checks payable to their order have held such payment constitutes proper payment to the principal. In *Potter v. Sager,* 184 App.Div. 327, 171 N.Y.S. 438 (4th Dep't 1918), the court reasoned that since an agent empowered to collect his principal's debts could receive cash payments, he could also receive checks payable to his order:

"[T]his court should take judicial notice of the fact that checks and drafts are usual and ordinary means of transacting business and transferring money in all business transactions; that where an agent is given authority to collect money . . . the giving of such check *payable to the agent* constitutes payment from the time such check is cashed in due course. . . ."

*Potter v. Sager, supra,* 184 App.Div. at 328–29, 171 N.Y.S. 438 (emphasis supplied); *see also Cohen v. O'Conner,* 5 Daly (N.Y.) 28 (1873), *aff'd,* 56 N.Y. 613 (1874) (payment by check to agent's order constituted good payment to principal despite agent's conversion of the proceeds).

We find, therefore, that RBH's direct payment to Equity as general manager was sufficient payment to plaintiffs as loss payees.