UNITED STATES of America,

v.

ACORN TECHNOLOGY FUND, L.P. Defendant.

No. 03–0070.

United States District Court, E.D. Pennsylvania.

Oct. 23, 2003.

John G. Silbermann, Wahington, DC, Paul G. Shapiro, U.S. Attorney's Office,

Robert J. Toy, Patrick K. McCoyd, Post & Schell, P.C., Philadelphia, PA, for U.S.

### MEMORANDUM

GILES, Chief Judge.

## I. INTRODUCTION

By Order of January 17, 2003, the United States Small Business Administration ("SBA") was appointed Receiver for Acorn Technology Fund, L.P. The Receiver was appointed for the purpose of continuing the operations of the limited partnership, including without limitation: managing its portfolio of investments; satisfying the claims of creditors and the sale of assets in the ordinary course of business; and defending and pursuing claims and causes of actions available to it. In the course of attempting to manage and recover all assets of the limited partnership, the Receiver discovered that Fleet National Bank[1] ("Fleet") held a certificate of deposit ("CD") in the name of Acorn Technology Fund, L.P. for the principal amount of $2.11 million.

On January 24, 2003, the Receiver made written demand upon Fleet for the release and turnover of the CD and any other funds held by Fleet in the limited partnership's name. Fleet refused to turn over the funds on the grounds that the CD was pledged as collateral for the guaranty of a loan extended to Princeton Valuation Consultants, L.L.C. As of September 18, 2002, an aggregate principal of $2,075,279.17 was owed to Fleet by Princeton Valuation Consultants, L.L.C.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1345.[2] The SBA, in its capacity as Receiver, has instituted the instant action under its vested power to bring suit on any causes of action on behalf of an entity placed in receivership. *See* 28 U.S.C. § 754.

Before the court is the Receiver's Motion to have the funds in the CD turned over to the Receiver and Fleet's Cross-Motion seeking leave of court to exercise its rights under the pledge agreement as a secured creditor of the CD or, in the alternative, to permit Fleet to create a constructive trust in its favor from CD funds. For the reasons stated below, the Receiver's Motion is granted and Fleet's Cross Motion is denied.

## II. FACTUAL BACKGROUND

John B. Torkelsen ("Torkelsen"), his wife Pamela Torkelsen, and family members have an interest in and/or control of four business entities that are tied to this dispute over the $2.11 million currently held in a CD with Fleet. These companies are: Acorn Technology Fund, L.P. ("ATF"); Acorn Technology Partners, L.L.C. ("ATP"); Princeton Valuation Consultants, L.L.C. ("PVC"); and Princeton Technology Management, L.L.C. ("PTM"). Torkelsen's representations to Fleet regarding management fees that allegedly accrued between PVC and ATF form the underlying basis of the controversy. Neither Torkelsen nor his family members have testified in regard to this matter inasmuch as they are targets of a criminal investigation by the Department of Justice and have, therefore, properly invoked their Fifth Amendment rights. As a result, the briefs of the parties on both sides have relied upon Fleet's internal documents to support their claims and arguments.

---

**1.** Fleet is a National Banking Association and the successor-by-merger to Summit Bank. (Fleet's Mem. Opp'n. Turnover at 2.)

**2.** 28 U.S.C. § 1345 states that the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress. *Id.*

ATF is a New Jersey Limited Partnership formed pursuant to a certificate of limited partnership filed with the Secretary of State of New Jersey on September 29, 1997. (Receiver's Mem. Supp. Turnover Ex. 8 FL–692.) The partnership was organized for the purpose of operating as a Small Business Investment Company[3] ("SBIC") subject to regulation by the SBA as provided for in the Small Business Investment Act of 1958, as amended, 15 U.S.C. § 661 *et seq.* (*Id.* at Ex. 8 FL–724.) ATF's sole general partner is Acorn Technology Partners, L.L.C., ("ATP"). (*Id.* at Ex. 8 FL–692.) As an SBIC, ATF provides venture capital, usually as an early stage institutional investor, to start up technology companies that principally are in the fields of e-commerce, e-healthcare, information technology, and software development. (*Id.* at Ex. 4 FL–357, Ex. 6 FL–1880.) ATF was capitalized with contributions from the SBA and by individual private limited partners. (*Id.*) The SBA contributed its financing on a 2:1 ratio; the SBA contributed a two dollar match for every private dollar raised. According to ATF's year to date June 2000 financials, the SBA contributed $25.2 million in capital in participating securities.[4] (*Id.* at Ex. 6 FL–1886.) ATF's profit allocation plan requires that the SBA receive approximately 10% of the profit of investments acquired with SBA leverage upon liquidation of the investment; thereafter 25% to 30% of profits are to be paid to the general partner, ATP, with the remaining 65% to 55% of profits to be allocated among the limited partners. (*Id.*)

ATP is a New Jersey Limited Liability Company and serves as ATF's sole General Partner. (*Id.* at Ex. 6 FL–1880.) Torkelsen is the president and manager of ATP. (*Id.* at Ex. 8 FL–771.) ATP is owned by several individuals with Pamela Torkelson as the primary shareholder. As General Partner, ATP is entitled to charge and collect annual management fees, as allowed by the SBA for operation of ATP's business affairs. (*See* Ex. 8 FL–744.)

PVC is a New Jersey Limited Liability Company whose ownership interests are structured as a Torkelsen family holding company with Pamela Torkelsen owning 80%, Leif Torkelsen, John Torkelsen's adult son, owns 10%. The Torkelsen Ladies, an unidentified group of investors, owns 10%. (Receiver's Mem. Supp. Turnover Ex. 6 FL–1880.)

PTM is a New Jersey limited liability company which is also structured as a Torkelsen family holding company with the same individuals owning interests in the same percentages as that of PVC. (*Id.*) PTM is the investment advisor to ATF and is responsible for hiring ATF personnel. (*Id.*)

In 2000 the credit demands of the Torkelsen controlled entities began to exceed the financial limits of the small banking institutions with which they were doing business. It was determined that these financial institutions were "of a size that proved to be an impediment for credit facilities." (Receiver's Mem. Supp. Turnover Ex. 4 FL–356.) Accordingly, Torkelsen sought to establish new banking

---

**3.** A Small Business Investment Company is an incorporated body, a limited liability company, or a limited partnership organized and chartered under State law for the purpose of performing the functions and conducting the activities contemplated under the Small Business Investment Act. 15 U.S.C. § 681(a). Companies licensed under the Small Business

Investment Act are subject to regulation by the SBA. *Id.*

**4.** Participating Securities means preferred stock, preferred limited partnership interests, or similar instruments issued by Licensees, including debentures having interest payable only to the extent of earnings. 15 U.S.C. § 683(g); 13 C.F.R. § 107.50.

relationships for his companies. (*Id.*) In August 2000, Torkelsen met with Jim Napoda ("Napoda"), then Account Officer and Vice President of Summit Bank ("Summit"), to discuss banking opportunities available through Summit. A lunch meeting with Napoda was arranged by Paul Shur and Rick Pinto,[5] Torkelsen's attorneys, at Torkelsen's office located at 5 Vaughan Drive in Princeton. (*Id.*)

Napoda concluded that the lunch meeting was a significant success. (*Id.*) Torkelsen discussed the venture capital firm he managed, the businesses controlled by the family, and the credit opportunities he wanted to explore with Summit, including a credit facility to PVC for tax-related purposes. (*Id.*) Beyond the borrowing needs of his companies, Torkelsen explained that he foresaw lending opportunities for Summit in the refinancing of an investment condominium in Lambertville, New Jersey owned by Pamela Torkelsen. (*Id.*) He also suggested that prospective opportunities existed in large cash balances maintained by the Torkelsens' companies. Torkelsen told Napoda that his companies regularly kept $4 to $5 million in balances in a combination of CDs or depository accounts. (*Id.*) He stated that Pamela Torkelsen was the owner of several retail stores, including The Golden Rhino located at 51 Bridge Street in Lambertville, New Jersey. (Receiver's Mem. Supp. Turnover Ex. 4 FL–356.) He described Pamela Torkelsen's other holdings as including a condominium in Phoenix, Arizona located in the Waterworks complex, valued at $700,000, and a horse breeding farm in New Hope, New Jersey. (*Id.*)

In Napoda's August 1, 2000 memorandum, he noted the advantages of a client relationship with the Torkelsens. He also documented the risks to Summit if a banking relationship were established. He observed that all financial statements submitted in support of a credit facility request would reflect that the Torkelsens' assets were listed primarily in Pamela Torkelsen's name or in Trust. (*Id.* at Ex. 4 FL–357.) He noted that he was told that, on the advice of counsel, ownership was transferred to Pamela Torkelsen after a consulting business owned by Torkelsen went into default. (*Id.*) He recorded that Torkelsen disclosed that he had incurred federal tax liens based on bad financial advice. (*Id.*) Napoda also noted that he had been told that those liens were being settled through negotiations with the Government and that it was expected that the liens would be settled for $500,000. In light of this information, Napoda formed the belief that profitable opportunities existed for Summit through the establishment of accounts and investment property loans, as well as the loans secured by CDs. (*Id.*) He felt that if he and his Summit team put their heads together and actively pursued Torkelsen they could "do something good for the customer and Summit." (*Id.*)

On August 21, 2000, Napoda and Torkelsen met again. This time, they met at the Torkelsen private residence in Princeton, New Jersey. Pamela Torkelsen participated in the meeting. The purpose of the meeting was to discuss financials relative to a residential mortgage for a condominium in New Hope, New Jersey. Napoda was affected by the appeal and charm of the Princeton residence as evidenced by

---

5. Paul Shur and Rick Pinto are attorneys affiliated with the law firm of Smith, Stratton, Wise, Heher & Brennan. (Receiver's Mem. Supp. Turnover Ex. 4 FL–356; FL–298; FL–342.) The Smith Stratton firm has served as counsel for Torkelsen since 1984 and has worked extensively on the venture capital activities of Acorn Technology Fund, L.P. (*Id.* at FL–342.) The firm has also advised Pamela Torkelsen with respect to her real estate holdings in New Hope, Pennsylvania, as well as with other investment properties. (*Id.*)

his internal memorandum of that date. In part, he wrote that "the residence is the most impressive that I have seen in my many years here in Princeton." (*Id.* at 4 FL–298.) The beauty and expanse of the residence convinced him of the Torkelsens' success and wealth.

Torkelsen told Napoda that ATF planned to open a number of accounts with Summit and that the bank could expect that a number of other accounts would be opened on behalf of Pamela Torkelsen's businesses. (*Id.*) For this, Torkelsen asked Napoda to provide a credit facility fully secured by a CD for $2 million. (Receiver's Mem. Supp. Turnover Ex. 4 FL–298.) Napoda foresaw the credit facility as a bridge to Summit providing other profitable financial services to the Torkelsens. He recorded in his August 21, 2000, notes that "[t]he receipt of detailed financial information will give [Summit] a better understanding of the Torkelsen family and their various investments so that we can properly underwrite any and all facilities and be in a position to cross-sell the Bank's numerous services." (*Id.* at Ex. 4 FL–298.)

In September 2000, the application process for the loan to PVC was initiated. An internal Summit credit analysis was prepared by Steve Zajac ("Zajac"), a loan officer. (*Id.* at Ex. 6 FL–1880–1882.) Zajac recommended that Summit lend PVC $2 million on the condition that the loan be fully secured by a $2.2 million liquid Short Term Investment Management ("STIM") account. (*Id.* at Ex. 6 FL–1882.) The $2.2 million would cover the principal and one year of interest for the term loan. (*Id.* at Ex. 6 FL–1881.) It was anticipated that ATF would provide the necessary collateral by funding the STIM account from its own cash assets. The analysis recorded that the purpose for the loan was reimbursement for outstanding fees which totaled $8.4 million. This

amount was supposedly owed by ATF to PVC for managing the operations of ATF. Significantly, the analysis also identified the SBA regulations that required ATF to reserve $5 million of capital as cash. Therefore, the analysis concluded that direct payment to PVC was possible only if holdings of ATF matured for liquidation. (*Id.* at Ex. 6 FL–1880–81.)

Zajac's analysis showed that a management fee agreement existed between PVC and ATF that called for ATF to pay management fees to PVC when its investments were liquidated. However, the timing of such a liquidation could not be predicated with any accuracy and was further complicated by the performance of each investment. (*Id.* at Ex. 6 FL–1882.) Zajac opined that "while ATF may provide significant cash flow from future capital gains, the nature of ATF's investments is highly risky and the liquid collateral is appropriate." (*Id.* at Ex. 6 FL–1882.) Nevertheless, PVC was not entitled to management fees since it was not ATF's General Partner. (*See id.* at Ex. 8 FL–744) Summit chose not to question this irregularity and totally disregarded the document trail that showed that PVC was a Torkelsen family holding company wholly unrelated to ATF. Summit chose to accept Torkelsen's representations as to PVC's need for the loan and chose to rely on the CD to cover its exposure to risk.

A copy of ATF's Limited Partnership Agreement as well as financials purporting to show creditworthiness were supplied to Summit on behalf of PVC for the period ending December 31, 1999. (*Id.* at Ex. 6 FL–1883–84; Ex. 7.) The detailed income statement, prepared on a cash basis, reflected a net loss of $447,000 with operating expenses of $2.669 million. This exceeded revenues of $2.222 million. (*Id.* at Ex. 6 FL–1884.) The income statement for 1999 was not footnoted with any expla-

nation that professional fees, a line item expense, should be offset by a receivable for fees owed by ATF to PVC. A detailed balance sheet for PVC for the period ending December 31, 1999, reported negative net worth of $452,000 based on $842,000 in total assets against $1.294 million in liabilities. (*Id.* at Ex. 6 FL–1883.)

The loan package materials also included financials for ATF for periods ending December 31, 1998, December 31, 1999, and year to date June 30, 2000. (*Id.* at Ex. 6 FL–1887–90.) The detailed income statement for ATF reported a net loss in 1998 of $1.647 million, a net loss in 1999 for $1.169 million, and a net loss of $1.285 million as of June 30, 2000. (*Id.* at Ex. 6 FL–1887.) ATF's balance sheet did not reflect management fees owed to PVC.

On September 18, 2000, Torkelsen instructed Zajac by letter that PVC would be the borrower for the Torkelsen controlled entities and that collateral for the STIM account would be provided by ATF. (*Id.* at Ex. 7 FL–345.) This letter advised that all documents executed on behalf of ATF would have Torkelsen sign as Manager of ATP, the general partner of ATF and that Pamela Torkelsen, as president of PVC, would execute all documents on behalf of PVC. (*Id.*)

Over a three day period in September 2000, Torkelsen authorized the deposit of approximately $2.621 million into a checking account opened at Summit. (Receiver's Mem. Supp. Turnover Ex. 9 FL–400–03, 405–07, 396.) Thereafter, at least that amount was transferred to the STIM account established in ATF's name as collateral for the PVC loan. (*Id.*)

On September 28, 2000, a loan agreement and a private bank promissory/credit note were executed between Summit as lender and by PVC as the borrower for $2 million. (*Id.* at Ex.11 FL–1221–23, 1224–29.) Pamela Torkelsen and Leif Torkelsen, as managers of PVC, were signatories to the loan documents. (*Id.* at Ex. 11 FL–1221–23, 1224–29.) Repayment was to be made in a single payment on September 28, 2001. Simultaneously, a private bank pledge and a security agreement were executed between ATF and Summit. Pursuant to this document, ATF agreed as pledgor to guarantee payment of all amounts due under the PVC note. (Receiver's Mem. Supp. Turnover Ex. 12 FL–1178.) Torkelsen signed these documents as manager of ATP and as the general partner of ATF. (*Id.* at Ex. 12 FL–1180.) A certificate of limited partnership authorization was also executed which stated that ATP was authorized on behalf of ATF to execute and deliver to Summit a guaranty. (Fleet's Mem. Opp'n. Turnover Ex. I.) Torkelsen was the sole signatory to this certificate. Summit accepted his representations through the certificate fully and without question and did not determine through independent investigations whether SBA authorization had actually been issued permitting this transaction. Shortly thereafter, Summit issued to PVC three separate treasurer's checks totaling $2 million. (Receiver's Mem. Supp. Turnover Ex. 13.)

Two weeks *after* the loan proceeds were disbursed to PVC, Summit sought character references on Torkelsen. Summit chose not to seek the aid of counsel during the review period of PVC's loan application (*Id.* at Ex. 14 FL–342), and Summit did not avail itself of counsel to investigate the corporate structures of PVC, or its purported guarantor, ATF. (*See* Ex. 6 FL–1878; Ex.18 FL–1625.)

By October 2000, Summit was pursuing the prospect of lending PVC another $1 million. (*Id.* at Ex. 15 FL–2365.) In anticipation of approval, Torkelsen authorized an October 3, 2000, wire transfer of $1.5 million drawn from ATF's California Bank and Trust account. This transfer

was deposited in the STIM account that was previously established as the collateral for the credit facility extended to PVC. (*Id.* at Ex. 17 FL–390–91.) Notwithstanding the substantial deposit to the STIM account, the request for another credit facility required Summit to assess the current loan request and to re-evaluate the credit facility approved in the prior month.

On October 17, 2000, a conference call[6] was held with Summit loan officers and the Torkelsen accountants to discuss the purpose of the previous $2 million loan to PVC and the recent loan request for an additional $1 million. (*Id.* at Ex. 15 FL–2368.) Zajac authored an internal memorandum, which recorded his recollection of the conference. Zajac noted that he was told that ATF was not in a position to pay PVC for the various fees and expenses since ATF's assets were fully committed in a variety of investments with holding requirements for periods of one to five years. (*Id.*) Further it was stated that all expenses and fees were expected to be repaid when the ATF investment portfolio was partially or fully liquidated, thereby creating a large cash flow which could be down streamed to PVC. (*Id.*) Zajac noted that Summit was also told that ATF was restricted from borrowing the funds directly to reimburse PVC because borrowing was limited under its charter as an SBIC and the SBA's regulations under which it operated. (*Id.*)

Napoda, who also participated in the conference call, prepared an internal memorandum dated October 17, 2000. He recorded that Torkelsen's accountants stated that the purpose of the new loan was to defer tax consequences related to the liquidation of investments held by ATF and to preserve any available cash for prospective investments while the purpose of the former loan was to cover expenses or management fees owed to PVC. (*Id.* at Ex. 16 FL–323.) The accountants stated that ATF was not in a position to pay PVC management fees until an investment was liquidated. Therefore, the purpose of the loans was to cover timing difference and accruing management fees. (*Id.*)

Subsequent to that call, a Summit loan offering analysis dated October 19, 2000 was prepared. It recommended approval for the loan of an additional $1 million to PVC. (*Id.* at Ex. 18 FL–1623.) On October 25, 2000, a $1 million loan agreement and private bank promissory/credit note between Summit and PVC were executed. (*Id.* at Ex. 19 FL–1243–48, 1249–51.) As with the initial loan made to PVC, the payment schedule called for the principal to be paid in a single payment on September 28, 2001. Torkelsen again executed a private bank pledge and security agreement which pledged the ATF assets held in the STIM account as collateral for the loan extended to PVC. (*Id.* at Ex. 20 FL–1234–36.) On October 27, 2000, Summit issued a check in the amount of $1 million to PVC. (*Id.* at Ex. 21.)

On December 28, 2000, Torkelsen executed, on behalf of ATP, a private bank collateral assignment of deposit account agreement and a pledge and security agreement. Together, these documents authorized the transfer of $3.075 million, a substantial portion of the monetary value held in the STIM account, to a Summit Jumbo CD and pledged these assets as collateral for the two loans extended to PVC. (*Id.* at Ex. 22 FL–1193–94; FL–1188–90.)

---

**6.** Maureen Rourke, Summit Vice President and Regional Manager; Jim Napoda, Summit Vice President and Account Officer; and Steve Zajac, Loan Officer of Summit Bank, participated in the conference call with Gary Parker and John Taylor of the Spielman Koenigberg and Parker accounting firm located in New York. The Spielman firm prepared returns for PVC and related entities. (Receiver's Mem. Supp. Turnover Ex. 16 FL–323.)

In 2001, Summit was acquired by Fleet. Shortly after acquisition, the Private Client Group along with other departments within Fleet initiated a review of the loans extended to PVC. The review was performed in advance of the September 28, 2001 maturity date. (*Id.* at Ex. 28 FL–1966.) Fleet's internal review was precipitated by a concern that the Summit loans had not been appropriately structured and that the SBA had not approved ATF's guarantees of the Summit loans. (*Id.*) Linda King, a Fleet loan officer, was especially concerned about financial statements submitted by ATF. In an internal memorandum dated August 1, 2001, she wrote:

> We recently received 2000 financial statements from ATF (audited) and PVC (internally prepared) as well as 2000 tax returns for ATF. In reviewing these financials, we noted a couple of items that we did not understand in view of the original purpose of the loan. AFT's balance sheet as of 12/31/01 (sic) does not include any fees or other items payable to PVC nor does PVC's balance sheet indicate fees payable from AFT. We also noted that ATF's financial statements contain no disclosure of the collateral pledged in support of our loan to ATF. In addition to these financial statement items that were not as we expected, ATF's financial statement indicated that PVC is no longer a limited partner in ATF.

(*Id.* at Ex. 24 FL–1852.)

Pursuant to Fleet's evaluation, Lydia C. Stefanowicz, an associate attorney with Drinker Biddle and Shanley L.L.P., was asked to review the loan documents and all related corporate documents so as to "insure that Fleet's interest was properly perfected and the loan to PVC was otherwise properly documented." (*Id.*) Stefanowicz reviewed the various loan documents, the SBA regulations regarding loans and management fees, borrower and guarantor organizational documents, financial statements, and a term sheet for a loan extension to PVC. (*Id.* at Ex. 25 FL–1913–16.) Despite knowledge of the SBA requirement for SBA written approval, she concluded that Fleet was adequately protected by its loan documents and that Fleet's collateral position regarding the pledged CD was properly perfected. (*Id.* at Ex. 28 FL–1966.)

The Private Client Group subsequently met with Torkelsen to discuss his intentions for repayment by the September 28, 2001 maturity date. (*Id.* at Ex. 28 FL–1966.) Torkelsen reported that the debt could not be paid by the designated due date. He explained that his liquidity problems were tied to a poor performing 2001 IPO market. ATF was reportedly prevented from taking any of the companies in which it invested to the public market. As a result, a source of repayment was not available and additional time would be needed to arrange refinancing to liquidate the debt with Fleet. (*Id.* at Ex. 28 FL–1966.) Torkelsen said he hoped that repayment would come from leveraging real estate owned by Pamela Torkelsen and that this could be accomplished by the end of the year. (*Id.* at Ex. 28 FL–1966.)

On September 28, 2001, an amendment to the loan and security agreements between Fleet and PVC was executed, which consolidated the two loans into one loan of $3 million and extended the maturity date from September 28, 2001 to a new maturity date of December 31, 2001. (*Id.* at Ex. 27 FL–1260–64; Ex. 28 FL–1966.) Pursuant to this agreement, principal and interest payments were scheduled out on an installment basis with $500,000 due by October 31, 2001, $1 million due by November 30, 2001 and the remaining balance due at the maturity date of December 31, 2001. (*Id.* at Ex. 28 FL–1966.)

On October 25, 2001, Torkelsen, unable to solve his liquidity problems, contacted Fleet's Private Client Group to request a deferral of the October 31, 2001 payment of $500,000. He stated that he was working with Commerce Bank regarding a $3 million loan secured by real estate which would be used to repay Fleet in full. (*Id.* at Ex. 28 FL–1966.) Fleet initiated discussions with Commerce Bank and learned that its repayment was likely to be delayed well beyond the October, November and December principal payment/maturity due dates. (*Id.* at Ex. 28 FL–1966.) As a result, the Private Client Group designated the PVC account for handling by Fleet's MAD Group, a department specializing in servicing accounts in defaulted status. An officer and team leader from this Group met with Torkelsen on December 5, 2001 at his home in Princeton, New Jersey. At this meeting, the Group learned that Torkelsen was trying to refinance the subject Fleet loan with two banks instead of one. He stated that Pamela Torkelsen planned to borrow $1 million from Progress Bank on the equity in their principal residence in Princeton and $2 million would be raised from refinancing four other commercial parcels of real estate owned by her to pay the remaining balance. In fact, refinancing was successfully arranged but it only generated $924,721. This amount was applied to principal and interest outstanding in February and March 2002.

Thereafter, another loan modification was executed which extended the maturity date to June 30, 2002. Torkelsen again was unable to satisfy the debt by the due date. He contacted Fleet and requested an extension for an additional eight months so that commercial property owned by Pamela Torkelsen could be sold to pay off the debt. (*Id.* at Ex. 28 FL–1966.) Torkelsen stated that the sale of the properties by his wife was the most likely alternative for repaying Fleet, but

an extension on the note would be required in order to list the properties and find a buyer. (*Id.* at Ex. 28 FL–1967.) Cautious not to generate negative press, Fleet opted to grant another extension to Torkelsen. It feared that a public relations fiasco might result if Fleet liquidated the CD to satisfy PVC's loans. (*Id.* at Ex. 28 FL–1967.) It observed that high profile individuals were investors in ATF and might be disturbed by the seizure of the CD especially since the capital contributions of those investors funded the CD and it was likely that they were not aware of ATF's guaranty. (*Id.; see also* Receiver's Mem. Supp. Turnover Ex. 10 Limited Partner Investments.)

Fleet's internal documents show that it attributed the defaulted status of the PVC loans to poor structure and unclear repayment sources. (*Id.* at Ex. 28 FL–1966–67.) Reliance was placed on the ATF CD held as collateral. Upon receipt and review of year-end financial statements, certain irregularities were noted by the Private Client Group, including the fact that ATF's financial statements contained no disclosure of the guaranty. (*Id.*)

Consequently, on July 31, 2002, the credit compliance department of Fleet recommended a loan modification to extend the maturity date to March 31, 2003. In accordance with the terms of the modification, Fleet charged a 1% forbearance fee on the principal balance outstanding as of March 31, 2003. All other terms and conditions of the loan remained in effect. (*Id.* at Ex. 28 FL–1966.) On September 18, 2002, a forbearance and modification agreement was executed between PVC, as borrower, ATF, as guarantor, and Fleet. Under the agreement Fleet agreed to forbear action to collect payment in full of PVC's obligations to Fleet under the loan documents until March 31, 2003.

On February 27, 2003, Joseph Petteruti, a Fleet loan officer, communicated by e-mail with Bruce Gray, another Fleet officer, to solicit information regarding his conversations with Lydia Stefanowicz during Fleet's August 2001 review of PVC's debt. (*Id.* at Ex. 26 FL–2084–85.) This correspondence demonstrates that Fleet was well aware that the structure of PVC's borrowing secured with ATF's assets was in direct contravention of SBA rules and regulations and that Summit had evaded the SBA's requirements. The e-mails excerpted below read as follows:

From: Petteruti, Joseph C.

Sent: Tuesday, February 25, 2003 3:28 PM

Subject: Princeton/Acorn

Dear Bruce,

Thanks for your help.

Would you mind just a quick response with regard to the essences of your 2001 conversations with Ms. Stefanowicz re: the enforceability of the Bank's Loan Documents? I want to pass it along to our attorney, Joe Finlay.

It sounds to me like our law firm knew that the borrower's loan was in violation of the SBA's agreement, but that Lydia stated that the Bank had enforceable documents and a perfected collateral interest, because Mr. Torkelsen made the correct reps and warranties to the Bank at the time of the loan. Did I get this right?

Thanks

(*Id.* at Ex. 26 FL–2084–85.) Bruce Gray responded with the following:

From: Gray, Bruce A.

Sent: Thursday, February 27, 2003 12:05 PM

Subject: Princeton/Acorn

Joe,

Counsel was informed of the fact that Acorn had failed to provide disclosure in its audited financial statements that the CD had been pledged as collateral. At the time of the renewal in 2001 I asked four questions of Counsel. Those questions and the answers were:

Did the pledge of the CD by Acorn require approval of the SBA? Counsel Answer: Yes

In reviewing the original closing documentation was there any evidence that the SBA approval was obtained? Answer: No, however, Counsel stated that there were representations and warranties in the documentation that all necessary approvals had been obtain (sic) and laws and regulations had been complied with. Counsel went on to say that the proper SBA approvals may have been obtained but not included with the loan documents.

As part of the renewal does Fleet need to obtain evidence that the SBA approval was given for pledge of the CD? Counsel Answer: No, refreshing the representations and warranty's would continue to preserve Fleet's collateral position.

What additionally (sic) documentation steps needed to be taken to ensure Fleet's collateral position was maintained? Counsel Answer: None, However counsel did caution that if Fleet had to move against the collateral to expect a challenge. Counsel said that the documentation would protect Fleet from that challenge. Counsel also noted that several prominent individuals were investor (sic) in Acorn.

I would also direct you to the loan underwriting request transmittal page of the 8/24/01 LOA where the RM noted the results of the Drinker Biddle review. Give me a call if you need any more help.

(*Id.* at Ex. 24 FL–1852.)

Eventually, PVC defaulted on the forbearance and modification agreement by

failing to pay interest pursuant to the terms of the agreement. On January 17, 2003, ATF was placed into receivership by Order of this court. As Receiver, the SBA demanded release of the funds held in a CD by Fleet. Fleet refused to turnover the funds claiming that the funds were pledged as collateral for the loans extended to PVC. On May 28, 2003, the Receiver commenced this action with a motion for an order to show cause why Fleet should not turn over the funds in the CD to ATF.

## III. DISCUSSION

The Receiver argues that ATF's loan guaranty, made without notice to or the consent of the SBA, is in direct violation of the Small Business Investment Act of 1958, 15 U.S.C. § 683(c) and regulation 13 C.F.R. § 107.550 promulgated by the SBA. The Receiver presses its claims pursuant to alleged violations of state agency and contract law. The Receiver argues that Fleet knowingly entered into an illicit debt guaranty agreement with Torkelsen, purportedly acting on behalf of ATF, in contravention of said federal law and regulations. Hence, the Receiver argues that ATF's guaranty is *void ab initio* and that Fleet has no legal claim to the CD funds.

Fleet counters that ATF's extension of the guaranty without obtaining the consent of the SBA did not render the guaranty unenforceable under the SBA Act, the regulations or the case law interpreting the Act. Fleet argues that the guaranty contract was executed in the ordinary course of business and that it had no knowledge of SBA's restrictions on third-party debt. Moreover, it asserts that it relied on Torkelsen's representations of SBA approval and his apparent authority as operating manager of ATF.

Additionally, Fleet argues that under the applicable provisions of the Act, the SBA is limited in the relief that it may seek. Fleet asserts that while the SBA has statutory authority, upon discovery of a violation, to forfeit, suspend or revoke the SBIC's license, issue a cease and desist order to apply for an injunction to enjoin further violations by the licensee, to petition a court to take jurisdiction over the licensee's assets or appoint a receiver to manage said assets, and to remove, suspend or disqualify the offending officer of the SBIC, it has not, under the language of the statute, been given a remedy of contract rescission against an innocent third party.

A. Fleet and Torkelsen Executed an Agreement That is Proscribed by Federal Statute and Regulations Promulgated by the SBA

■ The Receiver correctly argues that AFT's alleged guaranty and pledge of $2.11 million in favor of Fleet for a loan to PVC is in direct violation of the Small Business Investment Act and regulations governing SBICs because the SBA never consented to such a guaranty. Under the Small Business Investment Act, once an SBIC is granted licensure it is then an organization subject to federal legislation as well as SBA regulations promulgated in furtherance of legislation affecting SBICs.

Pursuant to 15 U.S.C. § 683(c), a provision of the Small Business Investment Act, an SBIC is prohibited, unless granted permission otherwise, from incurring third-party debt. The purpose of the requirement is to prevent an SBIC, which conducts business for the most part with federal funds, from exposing the Federal Government to risk of default or loss. The statute reads:

(c) Third party debt The Administrator—(1) shall not permit a licensee having outstanding leverage to incur third party debt that would create or contribute to an unreasonable risk of default or loss to the Federal Government; and (2)

shall permit such licensees to incur third party debt only on such terms and subject to such conditions as may be established by the Administrator, by regulation or otherwise.

15 U.S.C. § 683(c). The term "third-party debt" is defined by the act as "any indebtedness for borrowed money, other than indebtedness owed to the Administration." 15 U.S.C. § 662(11). The SBA promulgated 13 C.F.R. § 107.550 to allow indebtedness of this kind only in instances where approval was secured from the SBA. The regulation reads:

> § 107.550 Prior approval of secured third-party debt of leveraged Licensees. (b) General rule. If you have outstanding Leverage, *you must get SBA's written approval before you incur any secured third-party debt or refinance any debt with secured third-party debt,* including any renewal of a secured line of credit, increase in the maximum amount available under a secured line of credit, or expansion of the scope of a security interest or lien.

13 C.F.R. § 107.550(b) (emphasis added). The regulation defines secured third-party debt as follows:

> "secured third-party debt" means any non-SBA debt secured by any of your assets, including secured guarantees and other contingent obligations that you voluntarily assume, secured lines of credit, and secured Temporary Debt of a Licensee with outstanding Participating Securities.

13 C.F.R. § 107.550(a).

The guaranty contract which is the subject of the current controversy is obviously third-party debt. Accordingly, any pledge or guaranty executed and funded with an SBIC's assets and without SBA's written prior approval was in direct contravention of the statute and the regulations. Here, the evidence shows that the SBA's written approval was not secured before a pledge of ATF's assets was executed. Torkelsen, as ATF's general partner, was required to apply to the SBA for its written approval regarding any plan to incur third-party debt. He acted in contravention of this duty and had no authority, real or apparent, to represent that SBA had given authority. The evidence also indicates that Summit had prior knowledge of the statutory and regulatory restrictions on ATF's ability to enter in to such a transaction. From the outset, Summit was obligated to ascertain whether that written authority actually existed.

B. The Alleged Guaranty is Not Binding on ATF Because Torkelsen Lacked Actual Authority to Enter into Such an Agreement.

■ Fleet maintains that, pursuant to New Jersey's Uniform Partnership Law, ATF's execution of the guaranty and security agreements are binding upon ATF because Torkelsen had actual authority to execute the agreements on behalf of ATF. Fleet argues that the execution of these agreements by Torkelsen in his capacity as manager of ATF were valid acts of ATF and were entered into for the purpose of carrying on the usual business of ATF. Further, Fleet claims that it had no knowledge that ATF lacked the power to engage in such transactions.

The court finds that Fleet's position on this point is totally untenable. Summit, its predecessor in interest, was well aware that Torkelsen's role as General Partner to represent SBA approval was restricted by aforecited SBA federal statute and regulations, as well as by express limitations contained in ATF's partnership agreement. Under New Jersey's Uniform Partnership Law, the activity engaged in by Torkelsen was clearly outside the scope of ATF's business and therefore cannot bind ATF. Suretyship is not the nature of

ATF's business. ATF was established for the sole purpose of functioning as an SBIC and therefore the execution of any third-party debt was beyond the usual or customary course of ATF's business. This court finds unconvincing Fleet's argument that it lacked notice actual, or otherwise, of the restrictions imposed on ATF's ability to incur third-party debt. It was obligated to know that guarantying another company's debt was not an act in the ordinary course of business. Further, it knew absolutely that Torkelsen had no authority, real or apparent, to speak or bind AFT.

Fleet contends that New Jersey Limited Partnership law[7] is applicable to this case and notes that N.J.S.A. 42:1–9(1) is the provision that controls here. The court agrees. The provision states that:

> Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, *for apparently carrying on in the usual way* the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

N.J.S.A. 42:1–9(1) (emphasis added); *see also* 42:1A–13 N.J.S.A.[8]

New Jersey courts interpreting this provision have held that the acts of a partner bind the partnership only when those acts are for the purpose carrying on the ordinary business of the partnership. *See, e.g., Citizens First Nat. Bank v. Bluh,* 281 N.J.Super. 86, 656 A.2d 853, 858 (1995) (holding that "absent an agreement to the contrary, any partner can act as an agent of the partnership when apparently carrying on in the usual way the business of the partnership...."); *Bramblewood v. C and G Assoc.,* 262 N.J.Super. 96, 619 A.2d 1332, 1335 (1992) ("every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership ...").

 First, this court inquires whether Torkelsen was acting with authority and whether the loan guarantee was executed for the purpose of carrying on the business of ATF. The authority of a partner, under New Jersey's version of the Uniform Partnership Act, to incur third-party debt on behalf of the partnership has not been

7. "The Uniform Partnership Law, adopted in New Jersey in 1919, was repealed effective December 8, 2000 and replaced by the Uniform Partnership Act of 1997(Act), N.J.S.A. 42:1A–1 to 56." *First Am. Title Ins. Co. v. Lawson,* 351 N.J.Super. 407, 798 A.2d 661, 672 n. 4 (2002). The Receiver's brief cites to provisions of the Uniform Partnership Act, which did not come into effect until December 8, 2000, prior to that the Uniform Partnership Law was in effect. However, Fleet concedes that the provisions of the Act cited by the Receiver are virtually identical to the provisions of Partnership Law regarding the scope of authority of a General Partner.

8. The corresponding provisions under the Uniform Partnership Act read: a. Each partner is an agent of the partnership for the purpose of its business. An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing knew or had received a notification that the partner lacked authority. b. An act of a partner which is not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners. N.J.S.A. 42:1A–13(a), 42:1A–13(b).

considered in any reported New Jersey opinion. However, case law from other jurisdictions that have adopted the Uniform Partnership Act are instructive on this point and "in interpreting New Jersey's version of the Uniform Partnership Act it is appropriate to refer to the application of the statute in other states." *Conklin Farm v. Leibowitz*, 140 N.J. 417, 658 A.2d 1257, 1261 (N.J 1995). *See also Seventy–Three Land, Inc. v. Maxlar Partners*, 270 N.J.Super. 332, 637 A.2d 202, 203 (1994) (explaining that in instances where courts of other jurisdictions have adopted the Uniform Partnership Act and have considered an issue not reported in a New Jersey opinion those cases must be regarded as authority). The courts of all other jurisdictions agree that a partner executing a guaranty in the name of the partnership is engaging in a transaction that is uncommon to the business of the partnership and will be binding on the partnership only if that partner has the express authority of the entire partnership to act. *See, e.g., In re 9221 Associates v. Industrial State Bank*, No.CIV.A.91–0196–CV–W–1, 1991 WL 405172, at *3 (W.D.Mo. Oct. 7, 1991) [9] ("holding that [w]here the limited partners have not ratified the transaction, a partnership is not bound by a promissory note or mortgage executed by a general partner acting beyond the scope of his authority."); *Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 207 (Utah 1993) [10] (holding "that a partner who is without actual authority has no power to bind the partnership in a transaction that is not within the ordinary and apparent scope of the partnership business. Any person dealing with a partner can only rely on the partner's acts if they are within the ordinary and apparent scope of the partnership business."); *Jamestown Banking Co. v. Conneaut Lake Dock & Dredge Co.*, 339 Pa. 26, 14 A.2d 325, 328 (1940) [11] (holding that a bank guarantee is usually not given in the ordinary course of partnership business therefore all the partners must authorize by express authority or ratification a guarantee of third person debt); *Chelsea Nat'l Bank v. Lincoln Plaza Towers Assocs.*, 93 A.D.2d 216, 218, 461 N.Y.S.2d 328 (1st Dep't 1983) [12] (explaining that "the authority of a partner to guarantee, in the name of the partnership, obligations of third parties is not usual, and must be found in the partnership agreement or shown to be inherent in the partnership business."); *First National Bank of Ann Arbor, Mich. v. Farson*, 226 N.Y. 218, 223, 123 N.E. 490 (1919) ("it is a thoroughly established rule of law that a partner has no implied authority to bind his partner or the partnership by contracts of guaranty or suretyship, either for himself individually or for third persons."); *General Overseas Films, Ltd., v. Robin Int'l, Inc.*, 542 F.Supp. 684, 692 (S.D.N.Y.1982) ("The nature of a guarantee is such that however general the character of the agency may be, a contract of guaranty or suretyship is not normally to be inferred from such an agency.").

In *General Overseas Films*, a case similar to this, the lender, General Overseas Films ("GOF") brought an action against Anaconda Company ("Anaconda"), the guarantor, to collect on a loan guarantee that was executed by the company's Vice president and Treasurer, Charles H. Kraft ("Kraft"). GOF claimed that Anaconda

---

9. Missouri approved the Uniform Partnership Act for adoption on August 19, 1949. *See* Uniform Partnership Act § 9, 6 U.L.A. 275 (2001).

10. Utah enacted the Uniform Partnership Act on May 5, 1921. *See id.*

11. Pennsylvania enacted the Uniform Partnership Act on July 15, 1915. *See id.*

12. New York enacted the Uniform Partnership Act on October 1, 1919. *See id.*

promised through Kraft to guarantee the repayment of loans made by GOF to Robin International, Inc. ("Robin"). In 1976, Nicholas Reisini ("Reisini"), on behalf of Robin Company contacted Robert Haggiag, the manager of GOF to request a loan for $500,000. Reisini explained that Robin was involved in the construction of the Soviet Union's United Nations Mission in Riverdale, New York. Haggiag was told that there were claims of approximately $1 million against the project, but that he believed that the claims could be settled for about one-half that amount. Haggiag agreed on behalf of GOF to lend Robin and Reisini $500,000 for the purpose of settling the claims against Robin and in exchange Reisini agreed to repay the loan at 6 % interest and 50% of whatever savings could be achieved from settling the claims against the project. An agreement reciting the above mentioned terms of the loan was executed on May 28, 1976. In November 1976, Reisini requested an extension until January 15, 1977. As an incentive, Reisini offered to provide a guarantee from Anaconda. Shortly thereafter, Kraft was introduced to Haggiag and he told him that Anaconda would guarantee Robin's debt to GOF for up to $1 million. Eventually, GOF and Anaconda executed a promissory note for $800,000 and a guarantee for same, which specified September 13, 1977, as a due date. Upon learning that Reisini and Kraft had been implicated in a number of fraudulent transactions and after the grant of several extensions Haggiag demanded payment of the outstanding loan balance of $300,000. Reisini and Robin failed to satisfy the debt and Haggaig sought recovery from Anaconda.

The court concluded that the guarantee of Robin's debt was "unusual and extraordinary and so not normally within the powers accruing to an agent by implication, however general the character of the agency; ordinarily the power exists only if expressly given. Consequently a manager, superintendent, or the like, of business or property cannot ordinarily bind his principal as surety for third persons." *General Overseas Films, Ltd.,* 542 F.Supp. at 692. Further, it found that "[u]nlike a loan or other debt undertaken by [a debtor] for its own benefit, a guarantee results in a loan by the creditor of funds to a third party.... Unless the transaction has other elements connecting it to the guarantor, it is not the sort of arrangement in which the guarantor company's ... officer normally should be expected to engage." *Id.* Accordingly, the court held that Kraft had no authority to bind Anaconda to the guaranty.

It was or should have been abundantly clear to Summit that a general partner has no authority to bind the partnership by contracts of debt guaranty where the partnership has not expressly permitted such activity. It is undisputed that Torkelsen never secured or sought written approvals from ATF's limited partners to execute a loan guaranty for the benefit of PVC. The loan guaranty was proscribed by ATF's agreement of partnership. It was general knowledge and specifically known by Summit that ATF was established for the purposes of operating as an SBIC. The agreement of limited partnership[13] was

---

13. Paragraph 6.1.2.(e) of ATF's partnership agreement states that the General Partner is authorized to manage control and administer the affairs of the partnership. However, the General Partner's authority is subject to the provisions of the SBIC Act, including without limitation 13 C.F.R. §§ 107.550 and 107.570, to prepay in whole or in part, refinance, amend, modify or extend any debt which may affect any of the Assets owned by the Partnership and in connection therewith to execute for and on behalf of the Partnership any extensions, renewals or modifications of such debts on any such Assets in lieu of then existing debts. (Receiver's Mem. Supp. Turnover Ex. 8 FL–742.)

known to expressly limit ATF's ability to incur third-party debt and was known to read that when transactions of this type were contemplated the requirements of the Small Business Investment Act and the SBA's regulations governed the transaction.

Summit, Fleet's predecessor in interest, had in its possession and reviewed ATF's corporate governance documents that restricted the SBIC's ability to incur third-party debt entirely to written SBA approval. Paragraph 2.3. of ATF's partnership agreement reads:

> The Partnership is being organized for the purpose of engaging in any activity for which a limited partnership may be organized under the laws of the State of New Jersey; provided that at any time the Partnership is licensed as a small business investment company under the SBIC Act, it shall operate solely as a small business investment company under the SBIC Act and conduct only the activities described under Title III of the SBIC Act, and shall have the powers, responsibilities and be subject to the limitations provided in the SBIC Act.

(Receiver's Mem. Supp. Turnover Ex. 8 FL–742.)

Agreements guarantying the debt of an entity unrelated to ATF were known by Summit to be extraordinary transactions which ran counter to the very purpose of the partnership, which is to only engage in that activity that is in compliance with the SBIC Act. Summit knew that Torkelsen did not produce required written approvals for the guaranties.

A substantial percentage of ATF's capital was contributed by the Government. Thus, it was reasonable to expect that a bank would inquire of the SBA whether it consented to a transaction that had the potential to impair the Government's capital contributions. *See General Overseas Films, Ltd.,* 542 F.Supp. at 692 (explaining that "a principal will not be bound by the act of his agent in excess of his actual authority where the facts and circumstances are such as to put the person dealing with the agent upon inquiry as to the power and good faith of the agent."). Here, Summit knew, and Fleet learned, that the required written consent of the SBA was not part of the loan documents provided by Torkelsen.

Fleet cannot now seek relief from this court for its predecessor's own unsound business judgments. Summit chose to ignore federal law and regulations as well as ATF's agreement of limited partnership. It appears that Summit acted hastily to seize a seemingly profitable deal and turned a blind eye to ordinary caution.

The court finds that Torkelsen was expressly prohibited from committing ATF's assets as collateral for indebtedness incurred by PVC, an unrelated Torkelsen controlled entity. Further this court concludes that Summit failed in its duty to engage in due diligence to require proof of SBA written approval in compliance with SBA regulations governing SBICs as well as ATF's corporate governance restrictions.

**C. Torkelsen, as General Partner, Lacked Apparent Authority to Enter into the Pledge and Security Agreements**

■ Fleet argues that even if Torkelsen lacked express authority to bind the partnership, Summit had no knowledge that Torkelsen lacked this authority at the time the security agreements were executed. Fleet maintains that when Summit was approached by Torkelsen about the loan to PVC, Summit immediately inquired into the basis for the loan and the reason why it would be secured by ATF's pledge. In response, Torkelsen represented that the purpose of the loans was to pay off a

portion of the management fees ATF owed to PVC and that ATF was unable to pay PVC directly because SBA regulation required ATF to maintain approximately $5 million of its capital as cash. Further, Torkelsen stated that management fees would be paid to PVC when various investments owned by ATF were liquidated. Fleet claims that these representations coupled with the Certificates of Limited Partnership Authorization issued by Torkelsen, which attested to ATF's authority to execute the guaranty of PVC's debt were sufficient to convince Summit that Torkelsen had apparent authority to bind the partnership. In short, Fleet claims that is was duped by Torkelsen and its reliance was reasonable. The court concludes that these claims of reliance are implausible. Summit was a banking institution that regularly engaged in the practice of lending. It was not a novice to the world of finance nor was it unfamiliar with rudimentary loan procedures aimed at reducing exposure to risk. All data that should have led Summit to reject PVC's application for credit facility were readily available. Summit chose to disregard it.

In New Jersey "[a]pparent authority arises when a principal 'acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or not possess.'" *Lobiondo v. O'Callaghan*, 357 N.J.Super. 488, 815 A.2d 1013, 1018 (2003) (quoting *Rodriguez v. Hudson County Collision Co.*, 296 N.J.Super. 213, 686 A.2d 776, 780 (1997)). "Apparent authority imposes liability on the principal not as a result of an actual contractual relationship, but because the principal's actions have misled a third-party into believing that a relationship of authority in fact exists." *Mercer v. Weyerhaeuser Co.*, 324 N.J.Super. 290, 735 A.2d 576, 592 (1999).

The doctrine of apparent authority instructs that:

the principal is bound by the acts of his agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. The question in every case depending upon the apparent authority of the agent is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question.

*Lobiondo*, 815 A.2d at 1018–19; *Legge Indus. v. Joseph Kushner Hebrew Academy/JKHA*, 333 N.J.Super. 537, 756 A.2d 608, 621(2000); *Am. Well Works v. Royal Indem. Co.*, 160 A. 560 (E. & A.1932).

The evidence establishes that Summit was aware that ATF was regulated by the SBA. The evidence also shows that Summit had information in its possession that PVC was not entitled to collect management fees from ATF because it was not ATF's General Partner. According to the Agreement of Partnership only the General Partner, ATP, could charge fees with regard to operating and managing ATF.

Further, PVC's financials demonstrated that the company was a high credit risk. It was obvious from financials that reflected net losses and negative net worth that PVC lacked the resources to repay a note of $2 million, let alone $3 million. Summit knowingly entered into a transaction that effectively permitted a Torkelsen controlled entity to benefit from a borrowing that it could not repay. Hence, Fleet's claim of reliance is altogether unreasonable. Summit cannot by any measure be construed as an innocent third-party that acted in good faith. Torkelsen acted beyond the scope of his authority and Summit/Fleet had actual notice that Torkelsen

was exceeding his power as manager of ATP, ATF's general partner.

### D. ATF's Alleged Guaranty is Void under State Law

#### 1. Choice of Law

The Receiver asserts, without case law support, that Pennsylvania case law governs the issue of whether the alleged guaranty is illegal and therefore void *ab initio*. Fleet did not raise a choice-of-law issue in its memorandum of law. However, during oral argument held on July 24, 2003, Fleet did object to the Receiver's claim that the law of the forum court applied and proposed that New Jersey case law should be deemed controlling. Yet, Fleet did not identify any differing results if the laws of New Jersey were applied as against that of Pennsylvania.

■ This court need not embark on a choice-of-law analysis. "Before a choice of law question arises there must actually be a conflict between the potentially applicable bodies of law." *On Air Entm't Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir.2000). The third circuit has cautioned against proceeding on a choice-of-law analysis when the issue presents a false conflict. *See Lucker Mfg., Inc., v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir.1994). "Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a "false conflict" and the court need not decide the choice of law issue." *Lucker Mfg., Inc.*, 23 F.3d at 813 (citing *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 882 (3d Cir.1984)).

Research of applicable case law from both New Jersey and Pennsylvania uncovers no differences relating to the treatment of contracts that violate provisions of a federal or state statute. Given that the outcome of this issue would be the same under the laws of either state, the court will refer to the laws of both Pennsylvania and New Jersey in addressing the enforceability of ATF's loan guaranty. *See Lucker Mfg., Inc.*, 23 F.3d at 813 (applying interchangeably laws of the forum state and that of the foreign jurisdiction in resolving the issue of an insurer's duty to defend and indemnify).

#### 2. The Power Vested in the SBA, as Receiver, to Press Claims Alleging Violations of State Law

■ The Receiver argues that Fleet's claim as a secured creditor of the CD is unenforceable because the alleged loan guaranty is illegal and contrary to public policy and is, therefore, void *ab initio*. Fleet counters ATF's alleged extension of the guaranty without obtaining the consent of the SBA does not render the guaranty unenforceable under the Act, the regulations or the case law interpreting said Act because nullification is not an enumerated remedy. Fleet cites 15 U.S.C. §§ 687a, 687c, and 687e as authority for its position.

Fleet reads 15 U.S.C. § 687c too narrowly, overlooking the authority and function of a Receiver. The statute authorizes the SBA to act as receiver necessarily with all the powers normally vested in a Receiver to pursue and preserve claims and causes of action of an SBIC found to be in violation of the statute and regulations. The SBA is authorized to act as a Receiver, once the district court approves a petition requesting such an appointment. *See id.* Moreover, under 28 U.S.C. § 754, the SBA as Receiver is vested with complete jurisdiction and control over an SBIC's property whether real, personal or mixed and is granted the power to sue in any district without ancillary appointment. *See id.* Accordingly, the SBA has authority to file suit alleging state law causes of action and is entitled to seek relief, which may include declaration that a contract is void *ab initio*.

3. The Loan Guaranty Violated the Requirements of Federal Statute and Regulations and is Therefore Void

 SBA regulations specifically required prior written approval before ATF could incur third-party debt. This essential requirement was not satisfied before the alleged guaranties were executed. Torkelsen's failure to secure SBA approval and Summit's acquiescence in moving forward with the guaranties without the required written approval renders the loan guaranty void *ab initio*.

 A contract executed in contravention of a statute is void. *See Van Doren v. Staats*, 1811 WL 956, *3, 3 N.J.L. 887 (N.J.1811) ("[I]t is a settled rule, that courts of justice will not aid or render any assistance to enforce an illegal transaction ..."); *Lehigh Valley R. Co. v. United Lead Co.*, 102 N.J.L. 545, 133 A. 290, 291 (1926) ("A contract which violates the provisions of a statute is the simplest example of an illegal contract.... [Accordingly,] agreements in contravention of statutes are void."); *Grassi v. Rubert*, 85 Pa. D & C. 93, 96 (1953) ("The settled law of Pennsylvania is that a contract which violates a provision of a statute or an act of Congress is against public policy and is therefore, illegal, void and unenforeceable."); *New Jersey Bank v. Palladino*, 146 N.J.Super. 6, 368 A.2d 943, 947 (1976) ("As a general proposition, courts will not lend their assistance to either party to an illegal transaction which is void as contrary to public policy."); *Bryant v. City of Atlantic City*, 309 N.J.Super. 596, 707 A.2d 1072, 1090 (1998) ("A contract provision that is contrary to the requirements of a statute is void.").

Here, regulation 13 C.F.R. § 107.550(b) specifically requires that an SBIC "get SBA's written approval before ... [it] incur[s] any secured third-party debt or refinance any debt with secured third-party debt ..." *See id.* Torkelsen clearly did not comply with that provision and Summit had to know that he had not, and perhaps that he could not. It certainly knew that prior to closing on the loans that it did not have SBA written approval in its files for its protection. In short, Summit gambled and Fleet now loses.

## IV. CONCLUSION

Based on the foregoing it is adjudged that Fleet turnover to the Receiver forthwith the ATF funds in the CD that Fleet now controls.